J.T. BROWN, Plaintiff-Respondent-Petitioner,

v.

Louis MAXEY, d/b/a Apollo Village, and State Farm Fire & Casualty Company, Defendants-Appellants.†

Supreme Court

*No. 83–2325. Argued May 28, 1985.—Decided June 24, 1985.*

(Also reported in 369 N.W.2d 677.)

---

† Motion for reconsideration pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

428

For the plaintiff-respondent-petitioner there was a brief by *Michael J. Donovan, Charles J. Hausmann* and *Hausmann, McNally & Hupy, S.C.*, Milwaukee, and oral argument by *Mr. Donovan*.

For the defendants-appellants there was a brief by *Richard H. Schulz* and *Schulz & Schapekahm, S.C.*, Milwaukee, and oral argument by *Richard H. Schulz*.

LOUIS J. CECI, J.   This is a review of an unpublished decision of the court of appeals filed on October 25, 1984, affirming in part and reversing in part a judgment and order of the circuit court for Milwaukee county, David V. Jennings, Jr., circuit judge.   The court

of appeals affirmed the jury's award for compensatory damages but reversed the award of $200,000 in punitive damages. After reviewing the history of punitive damages in Wisconsin, the court of appeals held that punitive damages are not allowable as a matter of law because this cause of action is based upon negligence. The plaintiff seeks review of the portion of the court of appeals' decision reversing the punitive damage award. The defendants did not seek review of the court of appeals' determinations adverse to them.

Contrary to the court of appeals' decision, we hold that as a matter of law, punitive damages are available in negligence actions when "outrageous" conduct on the part of the tortfeasor has been proven by clear and convincing evidence and that in this case, the jury's award for punitive damages is supported by substantial credible evidence. Additionally, the policy of insurance issued to defendant Maxey does provide coverage for the punitive damage award against him. In so finding, we reverse the decision of the court of appeals.

This action arises out of a July 20, 1980, fire in the Apollo Village apartment complex (Apollo) in Milwaukee, Wisconsin. The plaintiff, J.T. Brown, was at the time a 46-year-old, disabled tenant, living in a third-floor apartment in one of the twelve three-story apartment buildings in the complex. Apollo Village, owned by defendant, Dr. Louis Maxey (Maxey), was a low income housing project built in 1970. The United States Department of Housing and Urban Development (HUD) guaranteed the construction mortgage for Apollo Village and, in addition, provided rent subsidies for low income, elderly, or disabled tenants of Apollo. Consequently, 188 of the 243 available rental units were subsidized by the HUD program.

As a result of a fire that was started in the hallway in front of Brown's door, Brown suffered second-degree burns to his upper back and neck area, which left him

with terrible scars. Brown commenced this suit against Maxey and his insurer, State Farm Fire and Casualty Company (State Farm), alleging that Maxey was negligent in his management of Apollo Village and that Maxey's failure to provide a safe place for the tenants of Apollo constituted outrageous conduct which entitled Brown to punitive damages. The jury found that Maxey's negligence was ninety percent causal of the plaintiff's injuries and that Brown's contributory negligence was ten percent causal of his injuries. The jury awarded Brown $22,500 for past pain, suffering and disability; $25,000 for future pain, suffering and disability; and $500 for future medical expenses. The past medical expenses were stipulated as $4,185. Additionally, the jury awarded $200,000 in punitive damages.

The two issues before this court are whether punitive damages are available in this case and, if so, whether the policy of insurance issued by State Farm to Maxey provides coverage for the punitive damage award.

## A.

The court of appeals, relying on *Entzminger v. Ford Motor Co.*, 47 Wis. 2d 751, 177 N.W.2d 899 (1970), and *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 294 N.W.2d 437 (1980), concluded "that punitive damages are not recoverable in a case of negligence" because historically, punitive damages have only been allowed in cases involving personal torts. In *Entzminger*, a breach of contract case, this court held,

"Punitive damages are not allowed for a mere breach of contract, . . . or for all torts or for crimes but generally for those personal torts, which are malicious, outrageous or a wanton disregard of personal rights which require the added sanction of a punitive damage to deter others from committing acts against human dignity. . . . The type of cases allowing punitive damages

has been cases of assault and battery, slander and libel, seduction, malicious prosecution, breach of promise, and the like." *Id.* at 757–58 (citations and footnotes omitted).

Additionally, in *Wangen,* a products liability case, we stated, "Punitive damages do not rise from negligence." 97 Wis. 2d at 275.

The issue of whether punitive damages are recoverable in negligence actions is a question of law.

"It is well settled that we review questions of law *de novo* without being bound by the decision of the trial court or the court of appeals." *Quinn v. Town of Dodgeville,* 122 Wis. 2d 570, 577, 364 N.W.2d 149 (1985).

In reversing the court of appeals, we hold that the availability of a punitive damage award is not dependent upon the classification of the underlying cause of action, but, rather, upon proof of the requisite "outrageous"[1] conduct. We stress that punitive damages are in the nature of a remedy and should not be confused with the concept of a cause of action.

"Whether compensatory damages, special damages, or punitive damages are sought as a matter of remedy or relief is immaterial to the cause of action itself." *Wussow v. Commercial Mechanisms, Inc.,* 97 Wis. 2d 136, 146, 293 N.W.2d 897 (1980).

In *Wangen,* 97 Wis. 2d 260, this court decided the issue of whether punitive damages are recoverable in products liability actions which are grounded in negligence or strict liability. We held,

"This court has rested its analysis of punitive damages not on the classification of the underlying tort

[1] As we have done in the past, we may use the term "outrageous" in this opinion as an abbreviation for the type of conduct justifying the imposition of punitive damages.

justifying compensatory damages but on the nature of the wrongdoer's conduct. Although the usual aggravating circumstances required for the recovery of punitive damages are often found as substantive elements of the tort itself, this court has said a claim for punitive damages may be supported by proof of aggravating circumstances beyond those supporting compensatory damages.

Punitive damages rest on allegations which, if proved, demonstrate a particular kind of conduct on the part of the wrongdoer, which has variously been characterized in our cases as malicious conduct or willful or wanton conduct in reckless disregard of rights or interests." *Id.* at 266–67 (footnotes omitted).

In a negligence case, if the plaintiff proves only those elements constituting the cause of action, punitive damages are not available. In fact, the vast majority of negligence cases do not give rise to the remedy of punitive damages.[2] However, the mere fact that the cause of action is based upon negligent conduct does not preclude a punitive damage award if the plaintiff proves the necessary aggravating circumstances beyond ordinary negligence. In such cases, punitive damages are appropriate to punish and deter the wrongdoer, just as they are in cases involving personal torts or products liability.

---

[2] The defendants argue that in cases involving allegations of negligence it is highly prejudicial to that claim for the plaintiff to present evidence which lends support to a claim for punitive damages. In *Wangen*, 97 Wis. 2d 260, we concluded that "[j]udicial controls exist in this state for determining whether the imposition of punitive damages is appropriate in the particular case . . . ." *Id.* at 298. First, use of motions *in limine* is encouraged. Second, "[i]n Wisconsin the trial judge initially determines whether the evidence establishes a proper case for the allowance of punitive damages and for the submission of the issue to the jury. . . . Unless there is evidence from which a jury could find that the wrongdoer's conduct was 'outrageous,' the trial court should not submit the issue of punitive damages to the jury." *Id.* (citations omitted).

Punitive damages may be awarded if the plaintiff proves by clear and convincing evidence that the defendant's conduct was willful or wanton, in a reckless disregard of rights or interests. *Wangen,* 97 Wis. 2d at 300. Defendants argue that there was no credible evidence adduced at trial from which the jury could reasonably conclude that the plaintiff met his burden of proof. An award of punitive damages will be upheld by this court if there is any evidence from which the jury could have reasonably concluded that the plaintiff met his burden of proving that the defendant's conduct was "outrageous." On review, "it is the duty of an appellate court to construe the evidence most favorably to the jury verdict . . . ." *Durham v. Pekrul,* 104 Wis. 2d 339, 349, 311 N.W.2d 615 (1981).

"It is not necessary for this court to conclude that, had it been the jury, it would have so held [that the defendant's conduct was outrageous]. Rather, the question is whether a reasonable jury, acting reasonably, could have so found." *Id.* at 348.

Before we review the sufficiency of evidence in the case, a brief review of the conduct necessary to impose punitive damages will be beneficial. Professors Ghiardi and Kircher explain that conduct justifying punitive damages is generally of two distinct types.

"The first type is that in which the defendant desires to cause the harm sustained by the plaintiff, or believes that the harm is substantially certain to follow his conduct. With the second type of conduct the defendant knows, or should have reason to know, not only that his conduct creates an unreasonable risk of harm, but also that there is a strong probability, although not a substantial certainty, that the harm will result but, nevertheless, he proceeds with his conduct in reckless or conscious disregard of the consequences. Neither form of conduct, therefore, involves mere inadvertence

or what, in the traditional tort sense, would be called ordinary negligence." J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice*, ch. 5, sec. 5.01 at 8–9 (1984) (footnotes omitted); cited with approval in *Lundin v. Shimanski*, 124 Wis. 2d 175, n. 14, 368 N.W.2d 676 (1985).

In the case at hand, which involves the underlying cause of action for negligence, it is clear that the plaintiff need not prove the element of intent as a prerequisite to recover punitive damages.

"This court has not required proof of an intentional desire to injure, vex or annoy, or proof of malice, in order to sustain an award for punitive damages. '[M]alice or vindictiveness are not the *sine qua non* of punitive damages.' *Kink v. Combs*, 28 Wis. 2d 65, 79, 135 N.W. 2d 789 (1965). It is sufficient if the injured party shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer. 'Reckless indifference to the rights of others and conscious action in deliberate disregard of them . . . may provide the necessary state of mind to justify punitive damages.' 4 Restatement (Second) of Torts sec. 908, comment b, p. 465 (1977)." *Wangen*, 97 Wis. 2d at 267.

In determining whether Maxey's conduct evidences a reckless indifference to or disregard of the plaintiff's rights, we focus on the defendant's knowledge and state of mind at the time of the fire. Since Maxey did not testify at the trial, this evidence was adduced from Maxey's employees.

At the time of this fire, Apollo Village had a substantial history of fires and lack of fire safety. Many of these fires were of suspicious origin, set by vandals and youths who would gain access to the buildings. Specifically, the fire department records indicate that in the building where Brown lived, building 11, there were five fires reported in the eight months preceding the fire in question. Three of these fires were of suspicious origin. Additionally, another fire was started

in front of Brown's door in the middle of the night, just weeks before he was injured on July 20, 1980. This fire was not reported to the fire department. The arson problem was so bad at Apollo Village that one of the maintenance crew testified that it "[w]ouldn't surprise me if it would be three fires in the same building at the same time."

Apollo Village was a high maintenance project, and it is apparent from the record that it was impossible for the maintenance crew to keep up with all of the problems. A major expense at Apollo was door locks. The buildings were designed to have locked doors on each floor and on the lower floor as one exits the buildings. However, these locks were constantly broken due to vandalism and a lack of jimmy plates, allowing anyone easy access to the buildings and each floor. Also, in building 11 where Brown lived, the basement door was to be secured by a lock, to which only the maintenance crew had a key. The lock on this door had been inoperable for some time prior to the fire.

Maxey employed a parttime property manager and four fulltime maintenance people. The maintenance crew worked Monday through Friday, 7:00 a.m. to 3:30 p.m. This meant that on weeknights and weekends there was no one employed to ensure security in the complex, despite the known fact of vandalism and arson during these hours.

In building 11, each floor was supplied with a locked, manually operated fire alarm system. Only the maintenance crew had the key to the locked system. One result of the security problems at Apollo was numerous false fire alarms, especially during those hours when the employees were not on the job. Once activated, the fire alarm would continue to ring until it was reset or until the circuit breaker to the entire system had been pulled. There was testimony at trial that it was common practice for the tenants to pull the circuit breaker

in the basement. In so doing, the fire alarm system would remain inoperable until the circuit breaker was reset. The circuit breaker box was not secured by a lock. No other alternative smoke detector or fire alarm system was supplied.

The security problem was so desperate at Apollo Village that the tenants set up a voluntary security force in an attempt to protect themselves from fires and vandals. The maintenance supervisor even testified that the fire problem at Apollo Village had gotten so severe prior to July 20, 1980, that a security force was necessary. This opinion is consistent with that of the other employees of Apollo Village.

On July 20, 1980, there was no employee on duty at Apollo Village; neither the exit doors, the doors to the third floor, nor the basement door in building 11 had functional locks; and the fire alarm system in Brown's building was inoperable because someone had pulled the circuit breaker. There was testimony at trial that the fire in front of Brown's door was intentionally started by a grandson of one of the tenants in Brown's building.

It is undisputed that Maxey was fully aware of the security problems at Apollo Village. He viewed the premises personally on various occasions and was also advised by his employees of the existing problems at Apollo. Despite his knowledge, nothing was done to make the complex reasonably fire safe. The plaintiff introduced expert testimony that, given the circumstances that existed at the time of this fire, a reasonable property owner would have provided a heat sensor fire alarm system, which would be directly connected to the fire department. That would have solved the problem of the false alarms and the disconnected circuit breaker. Moreover, there was testimony that the risk of fires could have been substantially reduced by supplying smoke detectors, security guards, jimmy plates and secure locks

on the doors, a lock for the circuit breaker box, and more thorough tenant selectivity.

The defendant argues that because HUD limits his maximum rate of return on his investment to six percent, he could not afford to make any improvements. We believe this defense is without merit. Even though Maxey advised his employees that there was no money available to resolve the problems at Apollo, there is no evidence in the record as to what profit Maxey actually received from the complex. Additionally, if Maxey did not receive any profit from the rentals, there is no HUD policy which restricts a property owner from investing additional sums of money if the condition of the premises presents a substantial risk of harm to the tenants.

We hold that there is substantial credible evidence to sustain the jury's award of punitive damages. A reasonable jury could conclude that the conduct of the defendant evidenced more than a lack of ordinary care. Given Maxey's knowledge with respect to the security problem and the history of fires at Apollo Village and his conscious refusal to reduce the risk of fires, we do not hesitate to hold that there is credible evidence from which the jury could reasonably conclude that Maxey's conduct evidences a reckless disregard of the rights and safety of Mr. Brown. Based upon the evidence concerning Maxey's failure to take action, it is reasonable to conclude that Maxey proceeded with a reckless and conscious disregard of the grave consequences involved with such conduct. Maxey's conduct, under these circumstances, was "outrageous."

In sum, on the basis of the record, we must reverse the court of appeals decision setting aside the punitive damage award. Additionally, we give deference to the fact that the trial judge, "who was familiar with the demeanor of the parties and the intricacies of the con-

duct of the trial," *Durham,* 104 Wis. 2d at 350, upheld the jury's award of punitive damages following motions after verdict.

"Where the record supports the jury's award of punitive damages and the trial court has approved punitive damages, an appellate court should not set aside the award in toto." *Id.*

The defendants argue that even if we affirm the award of punitive damages, the amount awarded by the jury was excessive.[3] The defendants argue that the punitive damage award in the amount of $200,000 is excessive, given the fact that the record is devoid of evidence of any malicious intention attributable to Maxey. Additionally, the defendants maintain that the award should not be sustained because the plaintiff failed to introduce evidence of Maxey's wealth.

In discussing the issue of excessiveness of punitive damage awards, this court has stated,

"Punitive damages must be decided on a case-by-case basis. The circumstances of each case must be considered to determine whether the award under the particular circumstances of that case serves the purposes of punitive damages. . . . An award which is more than necessary to serve its purposes (punishment and deterrence) or which inflicts a penalty or burden on the defendant which is disproportionate to the wrongdoing is excessive and is contrary to public policy. . . ." *Wangen,* 97 Wis. 2d at 302–03 (citations and footnote omitted).

"Factors to be considered in determining the proper amount to be awarded as punitive damages include: the grievousness of the defendant's acts; the degree of malicious intention; the potential damage which might have been done by such acts as well as the actual damage; and the defendant's ability to pay. . . ." *Fahrenberg v. Tengel,* 96 Wis. 2d 211, 234, 291 N.W.2d 516 (1980) (citations omitted).

---

[3] *See generally,* Annot. 35 A.L.R.4th 441 (1985).

After a review of these factors, the trial court denied the defendants' motion to set aside the punitive damage award, stating,

"Considering the character of Doctor Maxey's conduct, and the potential for catastrophe created by his conduct, this Court concludes that $200,000 serves the objectives of punishment and deterrence. The amount is not so large that it inflicts a penalty disproportionate to Doctor Maxey's wrongdoing. The amount does not shock the conscience of this Court."

We agree. First, we have held that Maxey's conduct evidences a conscious disregard for and an utter indifference to Brown's safety and the safety of the other tenants. The jury could have easily considered Maxey's conduct to be "grievous" in nature. Second, the actual damage to Brown was substantial. He suffered second-degree burns to over ten percent of his body; he was hospitalized for over two weeks; and he is left with terrible scars on his entire upper back and neck area, an itching sensation that has not been remedied, and psychological and emotional problems. Moreover, the potential damage to the hundreds of other tenants in the complex, which included the elderly, disabled and blind, was extreme. Finally, it is immaterial to our holding that no evidence was introduced regarding Maxey's ability to pay. "Failure to show net worth does not invalidate the award of punitive damages, but eliminates one factor by which the reasonableness of the award can be gauged." *Fahrenberg,* 96 Wis. 2d at 235.

We realize that the $200,000 awarded in the form of punitive damages in this case is substantial. This amount is approximately four times the amount awarded for compensatory damages. However, we have reasoned that

"[p]unitive damages are properly denominated 'smart money' and are designed to hurt in order to punish and

to deter. *Cieslewski* [*sic*] *v. Mutual Service Cas. Ins. Co.*, 84 Wis. 2d 91, 102, 267 N.W.2d 595 (1978)." *Fahrenberg* at 234.

This court has refused to adopt a mathematical formula for awarding punitive damages.

"In punitive damages, as in damages for pain and suffering, the law furnishes no mechanical legal rule for their measurement. The amount rests initially in the discretion of the jury. We are reluctant to set aside an award because it is large or we would have awarded less. As we have said in cases involving compensatory damages, ' "[A]ll that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience." ' . . ." *Id.* at 236 (citations omitted).[4]

For the above-stated reasons, we hold that the punitive damage award of $200,000 was not excessive.

The final argument espoused by the defendants with respect to the issue of whether punitive damages are recoverable in this case is that the punitive damage award must be reversed because the special verdict is fatally defective. Question one of the special verdict asked whether Maxey was negligent, and question two asked whether his negligence was causal. The jury answered both of these questions, "Yes." Question seven asked whether Maxey ratified, authorized or approved the acts and failure to act of the employees of Apollo Village which the jury found to be negligent in their answer to question one. The jury also answered this question, "Yes." Finally, question eight asked what sum of money the jury would set as punitive damages in this matter. The jury answered, "$200,000."

---

[4] *See e.g., Malco v. Midwest Aluminum Sales*, 14 Wis. 2d 57, 66, 109 N.W.2d 516 (1961), where we held that a punitive damage award which exceeded the compensatory damage award by fifteen times was not excessive.

The defendants believe that this verdict is fatally defective for two reasons: (1) The verdict did not require the jury to make a finding that the acts ratified by Maxey were willful, wanton or reckless, and, therefore, the jury assessed punitive damages for Maxey's ratification of the negligent acts of his employees, and (2) the verdict did not require the jury to make a specific finding that Maxey's conduct was willful, wanton or reckless.

Although this verdict could have been more clearly written, we disagree that it is defective. First, the jury was explicitly instructed that they could not award punitive damages unless they first determined that Maxey's acts were done maliciously or in a willful or reckless disregard of the plaintiff's rights. *See,* Wis. J I—Civil 1707. Second, we have held that the punitive damage award is supported by substantial credible evidence. Third, given the facts in this case, there is no need for a factual finding that the acts ratified by Maxey were "outrageous." Maxey's conduct that evidences "outrageousness" is not his ratification of anything performed by his maintenance crew, but, rather, his own refusal to take action to protect his tenants from the possibility of future fires. For these reasons, we hold that this verdict was not fatally defective.

## B.

We now turn to the issue of whether Maxey's insurance policy provides coverage for punitive damages. Actually, there are two questions involved: (1) Whether this State Farm policy provides coverage for punitive damages under the express language of the contract, and (2) whether such coverage, if it exists, is contrary to public policy in this state. We hold that the State Farm

policy issued to Maxey does provide coverage for punitive damages and that such coverage is not contrary to public policy.

State Farm agreed to pay *"all sums* which the Insured shall become legally obligated to pay as *damages* because of: A. *Bodily injury . . . ."* (Emphasis added.) The initial issue is whether this language extends coverage for punitive damages. The rules of interpretation and construction of insurance policies were recently summarized by Chief Justice Heffernan as follows:

"The construction of words and phrases in insurance policies is generally a matter of law and is controlled by the same rules of construction as are applied to contracts generally. . . . The objective in interpreting and construing a contract is to ascertain and carry out the true intention of the parties. . . . The words of an insurance contract are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood the words to mean. . . . The reasonable expectations of coverage of the insured should be furthered by the interpretation given. . . . Language in an insurance contract is to be given the common and ordinary meaning it would have in the mind of a lay person. . . . Words or phrases in a contract are ambiguous when they are fairly susceptible to more than one construction. . . . Whether ambiguity exists in a contract is a question of law. . . . Where no ambiguity exists in the terms of the policy, we will not engage in construction, but will merely apply the policy terms. . . ." *Kremers-Urban Co. v. American Employers Ins.,* 119 Wis. 2d 722, 735–36, 351 N.W.2d 156 (1984) (citations omitted).

We do not find that the language in this policy is ambiguous. First, the punitive damage award in this case was a "sum" that Maxey "[became] legally obligated to pay as damages." The term "damages" is sufficiently broad to cover liability for both compensatory and puni-

tive damages. Punitive damages are not specifically excluded from the policy language. Second, it is clear that these punitive damages were awarded "because of bodily injury."

"It is the infliction of bodily injury which gives rise to the cause of action. Once the cause of action arises, punitive or multiple damages are awarded in connection with, or because of, the injuries incurred. . . ." *Cieslewicz,* 84 Wis. 2d at 97 (citation omitted).

For these reasons, we hold that the language of State Farm's policy is broad enough to provide coverage for punitive damages. This holding is consistent with our ruling in *Cieslewicz,* where we determined that language identical to that found in State Farm's policy was broad enough to cover statutory multiple damages. *Id.* at 97. The following reasoning applied in *Cieslewicz* and is equally appropriate here.

"Essentially, what the insurer has done in this case is to 'sandbag' its own insured by using a provision which is phrased in very broad terms and which gives the insured the reasonable impression that protection is afforded. Upon presentation of the claim, however, the insurer has attempted to avoid responsibility for part of the damages, on the theory that multiple damages are not within the terms of the policy. In accordance with the principles adopted by this court in construing a policy of insurance, we hold that the multiple damages are included in the coverage clause of the policy." *Id.* at 98.

Defendants in this case also argue that the degree of conduct which gives rise to the imposition of punitive damages is specifically excluded from the terms of this policy. State Farm's policy provides that it will pay all damages because of bodily injury "caused by an occurrence." The policy defines "occurrence" as,

". . . an *accident,* including injurious exposure to conditions, which results, during the policy period, in bodily

injury, personal injury or property damage *neither expected nor intended from the standpoint of the Insured;* . . ." (Emphasis added.)

This court in *Pachucki v. Republic Ins. Co.,* 89 Wis. 2d 703, 278 N.W.2d 898 (1979), construed similar language[5] in an insurance polcy to act as an exclusion of coverage for intentional torts of the insured. In this case, however, we find no evidence of intentional conduct. Although there is substantial evidence that Maxey's conduct was "outrageous," we uncover no evidence that his conduct crosses over the line to be classified as intentional. For this reason, we decline to find that this fire was "expected" or "intended" by Maxey under the terms of this policy.

The final issue is whether public policy precludes insurance coverage for punitive damages. The courts throughout this country are sharply divided on this issue.[6] The trial court in this case relied on *Harris v. County of Racine,* 512 F. Supp. 1273 (E.D. Wis. 1981), holding that the insurance policy in question covers punitive damages. The court in *Harris* succinctly explains the two contrary positions concerning insurability of punitive damages as follows:

"Those cases which deny coverage stress the function of punitive damages, stated as being to punish the wrongdoer and to deter others from engaging in similar conduct. If such damages were insurable, the argument

---

[5] The policy language in *Pachucki* provided, "THIS POLICY DOES NOT APPPLY: . . . to bodily injury or property damage which is either expected or intended from the standpoint of the insured." 89 Wis. 2d at 705.

[6] *See generally,* J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice,* ch. 7 (1984); 15A *Couch on Insurance 2d* § 56:9 (rev. ed. 1983); 7A Appleman, *Insurance Law and Practice* § 4492.05 (Berdal ed. 1979); and Annot., 16 A.L.R.4th 11 (1982). *Compare, e.g., Northwestern National Casualty Company v. McNuly,* 307 F.2d 432 (5th Cir. 1962) (prohibiting coverage), with *Lazenby v. Univ. Underwriters Ins. Co.,* 214 Tenn. 639, 383 S.W.2d 1 (1964) (permitting coverage).

goes, the purpose for allowing them would be entirely undermined if a defendant could shift liability to an innocent third party, i.e., the insurer and ultimately the public in the form of higher premiums. Courts have noted that evidence of a defendant's wealth is generally admissible as the basis for assessing the amount of punitive damages, and thus, in theory at least, they are individually tailored to the defendant's ability to pay, and also that public policy forbids insurance against criminal fines which are also punitive and not compensatory in nature.

"Courts which permit recovery of punitive damages stress the private nature of a contract of insurance and hold that public policy favors compelling an insurer to perform those obligations for which it has contracted and received payment in the form of a premium, and which the insured reasonably expects to be performed, and which the insurer could have eliminated from the contract by the use of appropriate language. They also note that frequently there are alternative sanctions imposed on the offender in addition to the punitive damages, and some courts also question whether punitive damages in fact do have a deterrent effect." *Id.* at 1281.

This precise issue has not been resolved by this court. *Cieslewicz,* 84 Wis. 2d at 101, and *Wangen,* 97 Wis. 2d at 287, n. 13. However, with respect to a related issue, we have held that insurance coverage for statutory treble damage awards is not contrary to public policy. In *Cieslewicz,* a nine-year-old was bitten several times by a German shepherd dog owned jointly by a father and his son. The issue on appeal was whether it was contrary to public policy to insure against the treble damages which were awarded to the plaintiff pursuant to sec. 174.04, Stats. 1977.[7]

---

[7] Section 174.04, Stats. (1977), provides,

"**Treble damages.** Any person suffering personal injury by any dog in the manner set forth in s. 174.01 may give notice to the owner or keeper of the act done, and if after such notice such dog shall injure any person, or wound or kill any horses, cattle, sheep or lambs, or do any other mischief or injury the owner

Therein, we considered the argument that allowing insurance to cover statutory multiple damages "may have the effect of softening the blow of both the punitive and deterrent aspects of these damages." 84 Wis. 2d at 103. This is the main argument espoused by the defendants in this case. In declining to hold that insurance against multiple damages is contrary to public policy, we stated,

" 'Public policy' is no magic touchstone. This state has more than one public policy. Another and countervailing public policy favors freedom of contract, in the absence of overriding reasons for depriving the parties of that freedom. Still another public policy favors the enforcement of insurance contracts according to their terms, where the insurance company accepts the premium and reasonably represents or implies that coverage is provided. *Cf., Price v. Hartford Accident & Indemnity Co.*, 502 P.2d at 524.

"Moreover, even conceding that allowing insurance coverage for multiple damages may reduce the elements of deterrence and punishment, insurance coverage by no means destroys these elements. Even if the treble damages are paid by an insurer, the fact that a dog attacking another person may be killed under sec. 174.01, Stats., may provide both deterrence and punishment. In addition, it may be expected that insurance companies will raise insurance rates for dog owners, or at least for those dog owners whose dogs have already attacked a person. Under these circumstances, insurance does not necessarily shift the burden from the individual dog owner to the general public, but simply spreads the burden out among similarly situated persons, while avoiding the devastating financial impact on particular individuals. The latter consideration is the very essence of the public policy which encourages and accepts insurance. Finally, there is always the possibility, as happened in the instant case, that the treble damages will exceed the policy limits, so that the owner of the dog

or keeper shall be liable to pay to the person injured thereby treble damages."

*Compare*, sec. 174.02, Stats. 1983–84.

is obligated to pay part of the damage award in any event. *Cf., Price v. Hartford Accident & Indemnity Co., supra." Id.* at 103–04.

Consistent with our holding in *Cieslewicz,* we specifically adopt the reasoning employed therein to the facts in this case. We find no overriding reason to deprive these parties of what they have freely contracted. State Farm had the option of excluding liability for punitive damages. It failed to do so and has presumably collected premiums which it believed to be sufficent consideration for such coverage. *See, Harrell v. Travelers Indemnity Co.,* 279 Or. 199, 217, 567 P.2d 1013 (1977).

Moreover, we are not convinced that allowing insurance coverage for punitive damages will totally alleviate the deterrent effect of such awards. For example, as a consequence of the punitive damage award, defendant Maxey's insurance premiums may rise, he may find himself unable to obtain insurance coverage, the punitive damage award may exceed coverage, and his reputation in the community may be injured.

Finally, punitive damages are designed not only to deter and punish the wrongdoer, but also are designed to serve as a deterrent to others. Allowing insurance coverage to extend to punitive damages will not thwart this purpose. In conclusion, we hold that it is not contrary to public policy in this state to insure against punitive damages. In so holding, we find that the policy of insurance issued by State Farm to Maxey does provide coverage for punitive damages.

*By the Court.*—The decision of the court of appeals is reversed.

STEINMETZ, J. (dissenting). Even though the complaint states Louis Maxey's conduct in failing to provide a safe place constituted outrageous conduct, the verdict

asked whether Maxey was negligent and whether his negligence was causal. The jury answered both questions "yes." Question seven asked whether Maxey ratified, authorized or approved the acts and the failure to act of the employees of Apollo Village which the jury found to be negligence in its answer to question one. The jury answered that question "yes" also. Then, without a verdict tie-up between a finding of wanton and malicious behavior of Maxey or his agents, the jury was taken to verdict question eight where it was asked what sum of money the jury set as punitive damages and the jury answered "200,000."

The majority gives an unsatisfactory explanation in order to affirm this defective verdict. The court does no more than speculate as to what the jury's answers would have been to unasked questions regarding wanton and malicious conduct. The theory in the case was a strong negligence issue and the verdict never converted to anything different except to ask the punitive damage question. That is not enough to infer the jury's answers to unasked questions.

The court states at p. 433 of the opinion: "Punitive damages may be awarded if the plaintiff proves by clear and convincing evidence that the defendant's conduct was willful or wanton, in a reckless disregard of rights or interests. *Wangen*, 97 Wis. 2d at 300." The jury was not asked whether it was proven that the defendant's conduct was willful or wanton except by implication of the punitive damage question. There is no way of knowing whether this jury applied the clear and convincing evidence burden to questions not asked on the verdict as to Maxey's conduct. The court may not use its judgment of the evidence to answer questions not asked of the jury.

The proof necessary for willful or wanton conduct in reckless disregard of others' rights or interests is by

clear and convincing evidence. This jury was instructed the proof as to negligence was a preponderance of the evidence and that is the standard it applied to questions one and two.

In the citation from Professors Ghiardi and Kircher, Punitive Damages Law and Practice, ch. 5, sec. 5.01 at 8–9 (1984), the quote states: "The first type is that in which the defendant *desires* to cause the harm sustained by the plaintiff, or *believes* that the harm is substantially certain to follow his conduct." (Emphasis added.) That conduct of desire or belief is similar to a knowledgeable attitude and being so callous as to not caring at all if something happens as a result of conduct. The cite continues:

"With the second type of conduct the defendant *knows,* or should have reason to *know,* not only that his conduct creates an unreasonable risk of harm, but also that there is a strong probability, although not a substantial certainty, that the harm will result but, nevertheless, he proceeds with his conduct in reckless or *conscious* disregard of the consequences." (Emphasis added.)

The cite finishes: "Neither form of conduct, therefore, involves mere inadvertence or what, in the traditional tort sense, would be called ordinary negligence." The distinction in the forms of conduct described in this article makes it clear that the conduct necessary for punitive damages clearly does not flow from the negligent conduct and therefore direct questions should be asked on the verdict regarding outrageous conduct. For a certainty of knowing what the jury is deciding, the verdict should be stated in terms of wanton, willful, reckless conduct before a punitive damage question is asked.

The dangerous statement intertwining negligence and intentional conduct is at p. 434 of the opinion: "In the case at hand, which involves the underlying cause of ac-

tion for negligence, it is clear that the plaintiff need not prove the element of intent as a prerequisite to recover punitive damages." The court then cites *Wangen,* 97 Wis. 2d at 267, which stands for the principle that more than negligence is required. *Wangen* stated at 275: "Punitive damages do not rise from negligence. . . . Only where there is proof of malice or willful, wanton, reckless disregard of plaintiff's rights can punitive damages be considered." In the next paragraph at 434 of the slip opinion, the court states: "[W]e focus on the defendant's knowledge and state of mind at the time of the fire." That sounds like the conscious, deliberate knowledgeable state of Maxey's mind is the key and that comes closer to intentional acts than it does of the acts that a reasonable person under the same circumstance would not commit or would be ordinarily negligent. The conduct at least is entitled to be decided by the higher burden of proof and not only by implication.

At p. 437 of the opinion, the court concludes: "[I]t is reasonable to conclude that Maxey proceeded with a reckless and *conscious* disregard of the grave consequences involved with such conduct." (Emphasis added.) That conclusion has to be drawn by implication from the punitive damage answer.

Wanton, willful, conscious, reckless conduct is not negligent action. It falls short of being intentional but probably is closer to intentional than negligent action. The courts recognize the distinction by applying the middle burden of proof of "clear and convincing" to find such conduct present. It is not enough to only apply that burden of proof to the damage question.

I would affirm the court of appeals and remand for a new trial so that appropriate preliminary questions are asked on the verdict regarding outrageous conduct before the punitive damage question is asked and answered.

The insurance industry should have been alerted by *Cieslewicz v. Mutual Service Cas. Ins. Co.*, 84 Wis. 2d 91, 95, 267 N.W.2d 595 (1978), to govern its policy language to directly exclude punitive damages from coverage. From page 95 to 101 that case deals with whether the language "legally obligated to pay as damages because of bodily injury" should also apply to punitive damages as well as triple statutory damages. The punitive damage application to the policy language was left open in *Cieslewicz.* The policy in *Cieslewicz* also covered damages "caused by an occurrence." Is it any wonder the argument that punitive damages do not represent payment for an occurrence was not accepted in this case. The insurance industry is advised by the majority opinion here that special policy language can exclude coverage for punitive damages and that appears to be a present statement of public policy by the court.[1] Insurance companies are also advised by the majority opinion that higher premiums can be charged if punitive damages are covered.

I do not understand the rationale of the majority in declaring public policy does not prohibit insurance coverage for willful behavior as long as a premium is collected for it. This appears to me to give license to violent, conscious, wanton, outrageous behavior as long as you can afford to pay for it in advance. The reasoning of the court at p. 447 is unacceptable to me. The court states: "For example, as a consequence of the punitive damage award, defendant Maxey's insurance premiums may rise, he may find himself unable to obtain insurance coverage, the punitive damage award may

[1] At page 447 the court states: "State Farm had the option of excluding liability for punitive damages. It failed to do so and has presumably collected premiums whch it believed to be sufficient consideration for such coverage."

exceed coverage, and his reputation in the community may be injured." None of those negative reasons lends any integrity to declaring that public policy approves of insurance coverage for wanton, willful malicious conduct. All society will now pay higher premiums for persons who come close to intentional reprehensible conduct and those who can afford high premiums for punitive damage coverage can be licensed to avoid what until now has controlled their conduct and that is they can avoid personal financial loss. I do not and cannot join this misguided reasoning as to what public policy allows.

The policy justifications for punitive damages are generally considered to be: punish the wrongdoer and specifically deter him and generally deter others from engaging in similar conduct. *See* 16 A.L.R. 4th sec. 3. To these policies the majority pays only lip service. There are few things so simple as the real effect which necessarily follows the imposition of the monetary liability of the punitive damages award. It is almost universally accepted that money talks. By tailoring the amount of punitive damages to the relative wealth of the individual, every wrongdoer is more or less equally affected by the sanction. The majority vitiates the primary effect of that award and substitutes it with secondary and reactive consequences claiming no compromise is made. The majority opines the wrongdoer's insurance premiums may rise, or worse, he may become uninsurable, and lastly, it speculates his reputation may be injured. Until now, courts and society in general have been satisfied that this pocketbook punishment by itself deters the wrongdoer and others from engaging in similar conduct and punishes the wrongdoer with direct financial liability.

I would affirm the court of appeals.