UNITED STATES FIRE INSURANCE COMPANY, Plaintiff-Appellant, v. CNA INSURANCE COMPANIES, Defendant and Counterclaimant-Appellee (Pluswood, Inc., Defendant and Counterclaimant-Appellant).

First District (1st Division)   Nos. 1—89—1615, 1—89—3480 cons.

Opinion filed May 6, 1991.

Judge & Knight, Ltd., of Park Ridge (Jay S. Judge and Martin D. Hoke, of counsel), for appellant United States Fire Insurance Company.

Foley & Lardner, of Chicago, and Foley & Lardner, of Milwaukee, Wisconsin (Randall S. Rapp, Joan M. Kubalansa, Nancy J. Sennett, Robert E. Shumaker, and Kevin P. Whaley, of counsel), for appellant Pluswood, Inc.

Johnson & Bell, Ltd., of Chicago (Thomas W. Murphy and Nancy Caron, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Pluswood, Inc. (Pluswood), a Wisconsin manufacturer of building materials, produces "Melaface," a product formed by the compression of special paper onto both sides of a particle board core using resin and hot presses. Dovetailed Enterprises, Inc. (Dovetailed), a kitchen cabinet manufacturer, purchased sheets of this Melaface and cut them into component parts for kitchen cabinets. These cabinets were then sold for installation to a large New York City apartment complex owned by the 81st West River Company (West River

Company). After the Melaface within the cabinets proved defective, West River Company brought suit against Dovetailed, who then filed a third-party complaint for indemnification against Pluswood. Pluswood sought insurance coverage for this suit from its primary carrier, Continental Casualty Company (Continental) (sued as CNA Insurance Companies) and its excess carrier, United States Fire Insurance Company (United).

United filed an action for declaratory relief against Pluswood seeking a declaration that its policies provided no coverage to Pluswood because West River Company's claim sought repair or replacement of Pluswood's product, a claim excluded under its policies' "sistership" exclusion. Pluswood counterclaimed against Continental seeking a declaration that coverage was available under Continental's primary policies for the policy years 1982-85. The circuit court of Cook County, applying Wisconsin law, granted (1) summary judgment to Pluswood and against United, finding that the "sistership" exclusion did not operate to preclude coverage, and (2) summary judgment to Continental, finding that no coverage existed for policy years 1984 and 1985 because Pluswood expected the property damage to the cabinets prior to the inception dates of those policies. On appeal, United and Pluswood contest the propriety of the respective summary judgment awards entered against them. We affirm in part and reverse in part.

The record reflects that Pluswood purchased from Continental primary insurance coverage in the amount of $100,000 for policy years 1982-1984 and $250,000 for policy year 1985. Under these policies, Pluswood received comprehensive general liability coverage requiring Continental "to pay on behalf of [Pluswood] all sums which [Pluswood] became legally obligated to pay as damages because of *** property damage *** caused by an occurrence." Under the definition section of the policies, Continental defined "property damage" and "occurrence" as follows:

> " 'property damage' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;
>
> 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

In addition, Continental policies for years 1982-1985 included an endorsement which provided:

> "It is hereby agreed that property damage coverage is extended to pay on behalf of the named insured the actual expense incident to the intentional destruction and removal of a product which is found to be defective. For the purpose of this coverage, 'defective' means a product which does not meet specifications. It is further agreed that coverage is extended to additional expenses paid as are necessary to replace the product in the same condition existing at the time such product was determined to be defective. A product is defined as all named insured's products manufactured, sold, distributed or handled."

As for Pluswood's excess insurance coverage with United, United provided Pluswood with $20 million in excess coverage for policy years 1981-1985. Under those policies' "sistership" exclusion, property damage liability coverage did not apply

> "to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the insured's products or work completed by or for the insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein."

The dispute regarding Pluswood's Melaface began on February 8, 1983, when West River Company wrote Dovetailed to inform it that some of the cabinets it had purchased were "crazing" or cracking. According to the letter, 92 vacant apartments were surveyed and crazing was found in 25 of them. The remaining 139 apartments were not inspected at this time since they were occupied; however, the letter noted that the problem was growing and everyday more cabinets were developing crazing. Pluswood admits receiving a copy of this letter. On February 16, Pluswood informed Continental that a possible claim existed regarding its cabinets.

On April 20, 1983, Dovetailed received another letter indicating that a recent survey showed that 57 out of 87 vacant apartments had the crazing problem. The occupied apartments had yet to be surveyed. The West River Company demanded in this letter that Dovetailed replace all of the doors, drawers and side panels in all 231 apartments, arguing that additional crazing was likely. Pluswood admits receiving a copy of this letter.

On May 2, 1983, Dovetailed wrote Pluswood informing it that there were serious problems with its Melaface and that the crazing

problem was extensive throughout the project. Dovetailed informed Pluswood that the Melaface breached express and implied warranties and, if Dovetailed were sued over the defects, Dovetailed intended to implead Pluswood as a party defendant to seek indemnification for any damages awarded against Dovetailed.

On September 8, 1983, West River Company filed its complaint against Dovetailed in the United States District Court for the Southern District of New York (the New York litigation). In its complaint, West River Company sought judgment against Dovetailed (1) directing it to specifically perform its warranty obligations under the agreement to repair or replace all damages to the cabinets, and (2) for damages in the amount equal to all costs incurred in connection with Dovetailed's repair or replacement of the cabinets.

On November 15, 1983, Dovetailed filed a third-party complaint against Pluswood seeking indemnification for all or part of any verdict rendered in favor of West River Company. Pluswood notified Continental, its primary carrier, of the claim against it. Continental undertook Pluswood's defense. As the New York litigation proceeded, the Melaface continued to deteriorate. Subsequent inspections demonstrated that as of October 1984, 30% of the Melaface had deteriorated; as of March 1986, 94% of the Melaface had deteriorated; as of April 1987, deterioration was complete.

This lawsuit began when United filed its action for declaratory relief against Pluswood, which then filed a counterclaim against Continental. Continental moved for summary judgment. In its motion, Continental did not dispute its duty to defend Pluswood or that coverage was available to Pluswood under Pluswood's 1982 and 1983 policies; rather, Continental disputed the existence of coverage under Pluswood's 1984 and 1985 policies. Continental contended that while "property damage" occurred during those policy years, the "property damage" was not caused by an "occurrence" as required under the policies because Pluswood "expected or intended" it prior to the inception of those policies. Pluswood responded with its own motion for summary judgment, contending that there was an "occurrence" under those policies because the proper moment to measure an insured's knowledge for "occurrence" purposes is at the time of the alleged negligent act, not the time immediately prior to the commencement of a policy. Consequently, Pluswood contended that because it is undisputed that Pluswood did not expect or intend the "property damage" to the cabinets at the time it manufactured the defective Melaface, there was an "occurrence" under the 1984 and 1985 policies. Alternatively, Pluswood argued

that notwithstanding its knowledge, the endorsement it purchased provided "property damage" coverage for those years because its Melaface panels were, as stated in the endorsement, "found to be defective" during those years.

The circuit court, faced with cross-motions for summary judgment, agreed with Continental's argument that prior to the inception of the 1984 and 1985 policies, Pluswood "expected" the "property damage" which transpired during those years. Accordingly, because the circuit court found no "occurrence" for those policy years, it granted Continental's summary judgment motion and declared that the claims asserted in the New York litigation were not covered by those policies.

As for Pluswood's excess coverage with United, Pluswood moved for summary judgment contending that the "sistership" exclusion, by its clear and unambiguous terms, excludes coverage only for the cost of repairing, replacing or withdrawing products which are withdrawn from the market or use because of known or suspected defects. United responded that its "sistership" exclusion denied Pluswood coverage for the claims asserted in the New York litigation because West River Company sought damages for the "repair and replacement" of Pluswood's own defective product: the components of the kitchen cabinets made from Melaface. United also at this time filed a notice of discovery deposition of Pluswood's vice-president. After Pluswood was unable to produce the deponent prior to the scheduled summary judgment hearings, United moved for a continuance. One day prior to the hearing, United served Pluswood with a request to admit whether the relief sought in the third-party action was for the repair and replacement of the defective cabinets. The circuit court denied United's motion for continuance.

Hearings on Pluswood's motion for summary judgment proceeded. Upon their termination, the circuit court agreed with Pluswood's interpretation of the exclusion and granted Pluswood's summary judgment motion, declaring that United must pay the full amount for which Pluswood may become liable in excess of the amount for which Continental is liable.

After the entry of summary judgment, Pluswood filed its response to United's request to admit and denied therein that the third-party claim was for the repair and replacement of the kitchen cabinets. Subsequently, United filed a motion for reconsideration of the court's grant of summary judgment. The basis for this motion was that the circuit court had permitted insufficient discovery to

clarify the issues created by Pluswood's summary judgment motion and that Pluswood's response to United's request to admit raised a genuine issue of material fact as to the nature of the relief sought in the third-party action.

The court denied United's motion for reconsideration. In so doing, the court emphasized that its interpretation of the exclusion was based on its plain language and, therefore, additional discovery would in no way impact upon the plain language of the exclusion. On appeal, United contends that (1) the circuit court's grant of summary judgment to Pluswood was based on an erroneous interpretation of the sistership exclusion, and (2) summary judgment was not proper in light of the discovery posture of the case.

The parties to this dispute agree that under Illinois choice of law rules, Wisconsin law governs the interpretation of the insurance policies. Under those rules, an insurance policy is generally governed by the law of the State where the policy was issued or delivered or by the law of the place of the last act to give rise to a valid contract. (*Jadczak v. Modern Service Insurance Co.* (1987), 151 Ill. App. 3d 589, 593, 503 N.E.2d 794, 797.) Here, each of the policies was issued in Wisconsin to a business operating in Wisconsin and each took effect only when it was countersigned in Wisconsin by the insurers' authorized agents. Accordingly, we apply Wisconsin law to this dispute.

In *Patrick v. Head of the Lakes Cooperative Electric Association* (Wis. App. 1980), 98 Wis. 2d 66, 69, 295 N.W.2d 205, 207, the court stated the principles which govern the interpretation of insurance contracts under Wisconsin law:

> "When ambiguous, an exclusionary clause in an insurance contract should be strictly construed against the insurer. [Citation.] The test of coverage is not what the insurer intended to cover, but what a reasonable person in the position of the insured would have understood to be covered. [Citation.] The words used in an insurance contract should be given their everyday meaning, [citation], and should be interpreted reasonably so as to avoid absurd results. [Citation.] Finally, there is a public policy in Wisconsin against the avoidance of coverage by an insurer, and the reasonable expectations of coverage by an insured should be honored."

With these principles in mind, the first issue we address is what meaning does this court ascribe to the phrase "expected or intended from the standpoint of the insured." A related issue is at what time is this court to measure the insured's state of mind.

■ Numerous Wisconsin cases have construed, in the context of intentional torts, the phrase "expected or intended by the insured" as it appears in a typical homeowner's exclusionary clause. (*Raby v. Moe* (1990), 153 Wis. 2d 101, 450 N.W.2d 452 (robbery); *Brown v. Maxey* (1985), 124 Wis. 2d 426, 369 N.W.2d 677; *Pachucki v. Republic Insurance Co.* (1979), 89 Wis. 2d 703, 278 N.W.2d 898 (battery); *Smith v. Keller* (Wis. App. 1989), 151 Wis. 2d 264, 444 N.W.2d 396 (battery); *Hagen v. Gulrud* (Wis. App. 1989), 151 Wis. 2d 1, 442 N.W.2d 570 (sexual molestation); *K.A.G. v. Stanford* (Wis. App. 1988), 148 Wis. 2d 158, 434 N.W.2d 790 (sexual molestation); *Poston v. United States Fidelity & Guarantee Co.* (Wis. App. 1982), 107 Wis. 2d 215, 320 N.W.2d 9 (battery); *Patrick v. Head of the Lakes Cooperative Electric Association* (Wis. App. 1980), 98 Wis. 2d 66, 295 N.W.2d 205 (trespass).) Under these cases, the expected or intended language has been narrowly construed to exclude only those injuries, however slight, which are intentionally caused. As for the distinction between the terms "expected" or "intended," Wisconsin law is unclear. In this regard, however, the court in *Poston v. United States Fidelity & Guarantee Co.* (Wis. App. 1982), 107 Wis. 2d 215, 221, 320 N.W.2d 9, 12-13, stated:

"While [our narrow interpretation of the clause] may not conclusively demonstrate that 'intended' and 'expected' are absolutely synonymous in Wisconsin with respect to policy exclusions, it does persuade us that the difference between them, if there is one, is sufficiently subtle so as to militate against basing a summary judgment upon it. ***

* * *

We are not persuaded that the trial court's characterization of 'expectable' and 'foreseeable' as synonymous is an apt characterization of law. If foreseeability of injury alone were enough to activate the policy exclusion, then many acts of mere negligence would be excluded. We do not read the clause to exclude both intentional *and* negligent acts. [(Emphasis in original.)] The *Pachucki* court characterized the exclusion as 'specifically *applying only to injuries intentionally caused.*' [(Emphasis added.)] [Citation.] To so broaden it as to exclude foreseeable injuries is unjustified."

■ In our opinion, while the exact difference between the terms "intended" and "expected" is not clear under Wisconsin law, *Poston* endorses the view that the term "expected" means more than foreseeability but less than the intent associated with the intentional acts cases cited above. Given these boundaries, we believe

that Wisconsin would adopt as its own the following statement from *City of Carter Lake v. Aetna Casualty & Surety Co.* (8th Cir. 1979), 604 F.2d 1052, 1058-59:

> "We reject the argument that a result is expected as that term is used in insurance policies simply because it was reasonably foreseeable. The reasonable expectation of an insured in securing a comprehensive general liability policy is that it will cover some negligent acts. It does not follow, however, that because the policy covers some negligent acts it must cover all negligent acts. An insured need not know to a virtual certainty that a result will follow its acts or omissions for the result to be expected. [Citation.] Rather, each case must be determined by examination of the totality of the circumstances. For the purposes of an exclusionary clause in an insurance policy the word 'expected' denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions. If the insured knew or should have known that there was a substantial probability that certain results would follow his acts or omissions then there has not been an occurrence or accident as defined in this type of policy when such results actually come to pass. The results cease to be expected and coverage is present as the probability that the consequences will follow decreases and becomes less than substantial probability."

Given the above distinction between "expected" and "intended," we now address the related issue of when, under Wisconsin law, is an insured's state of mind to be measured. Initially, we note that Continental's policies are silent on this issue. These policies merely provide that the resulting property damage can be neither expected nor intended from the standpoint of the insured. Pluswood urges that Wisconsin courts would interpret this language to mean that the *only* proper time at which to measure the insured's state of mind is when the insured commits the act in question. We decline Pluswood's urgings, and believe that Wisconsin courts would agree that it is appropriate to measure an insured's state of mind at the time prior to the inception date of the policy in question and, given the appropriate facts, to even bar coverage where such state of mind reflects expectation or intention.

■ First, under Wisconsin's rules of interpretation, Wisconsin courts are to give words in insurance contracts their everyday meaning and interpret them reasonably so as to avoid absurd

results. Moreover, an insured's reasonable expectations are to be honored. (*Patrick*, 98 Wis. 2d at 69, 295 N.E.2d at 207.) Applying these principles, we believe that a Wisconsin court would not read Pluswood's suggested time limitation into the expected or intended clause where none is present. Additionally, we believe that no insured would reasonably expect coverage for property damage which it "expected" prior to the inception of a given policy. Such an expectation would lead to an absurd result. Second, we believe that Wisconsin's courts would find persuasive the fact that other courts have reached the conclusion we reach today. Compare *City of Johnstown v. Bankers Standard Insurance Co.* (2d Cir. 1989), 877 F.2d 1146 (duty to defend exists where court could not say as a matter of law that insured expected or intended groundwater contamination prior to policy's inception), with *New Castle County v. Hartford Accident & Indemnity Co.* (D. Del. 1988), 685 F. Supp. 1321 (summary judgment in favor of insurer on indemnity issue where insured expected groundwater contamination prior to policy's inception); see also *Charles H. Eichelkraut & Sons, Inc. v. Bituminous Casualty Corp.* (1988), 166 Ill. App. 3d 550, 519 N.E.2d 1180 (coverage denied where insured expected property damage prior to policy's inception date).

██ Turning to the facts of this case, the parties do not dispute that Pluswood neither expected or intended the property damage at the time it manufactured the defective Melaface. This much is clear. We believe that a similar conclusion is reached even if Pluswood's state of mind is measured prior to the inception of the 1984 and 1985 policies. At that time, Pluswood knew that it had manufactured a defective product which was deteriorating with time. Admittedly, there were indications that all the Melaface could ultimately prove to be defective. However, at the inception of the 1984 and 1985 policies, it would have been complete speculation for Pluswood or anyone to predict the exact extent of the property damage that ultimately occurred during those policy periods. The property damage could have stopped or continued; the fact that it continued cannot be charged to Pluswood in retrospect. *Poston* makes clear that more than mere foreseeability is required. At most, all that can be said of Pluswood's knowledge at the inception of those policies is that future deterioration of the cabinets was foreseeable. Under Wisconsin law, this is insufficient.

A contrary conclusion in this case is not reached even if we were to follow *Charles H. Eichelkraut & Sons, Inc. v. Bituminous Casualty Corp.* (1988), 166 Ill. App. 3d 550, 519 N.E.2d 1180, a

case which Continental contends is dispositive. In *Eichelkraut &
Sons*, a school district sued the insured in 1978 for faulty construc-
tion of a high school. The factual allegations of the complaint al-
leged various defects and inadequacies in construction, installation
and selection of the roof of the school. The complaint alleged that
the roof leaked in approximately 120 locations; that the leaks had
begun upon completion of the school in 1969; that they continued to
the date of the suit; that the roof progressively deteriorated; and
that the insured failed and refused to rectify the situation. The in-
sured sought coverage for the suit from three carriers: Liberty Mu-
tual for the policy years 1968-1970; Wausau from 1970-1973; and Bi-
tuminous from 1973-1978. Liberty Mutual and Wausau undertook
the insured's defense, but Bituminous refused, alleging that the in-
sured expected or intended the property damage prior to 1973, the
inception date of its policies. The court agreed with Bituminous
that, under the allegations of the complaint, the insured "knew or
should have known about the defects in its construction by the time
Bituminous issued its general liability policy in 1973, four years af-
ter completion of construction." *Eichelkraut & Sons*, 166 Ill. App.
3d at 555, 519 N.E.2d at 1183.

The court in *Eichelkraut & Sons*, in reaching its conclusion,
found persuasive *United States Fidelity & Guaranty Co. v. Bonitz
Insulation Co.* (Ala. 1982), 424 So. 2d 569. In that case, Bonitz was
a contractor who built a gymnasium roof in the fall of 1972. By late
fall, the roof began to leak and Bonitz was thereafter informed of
the problem. Despite attempted repairs, the roof continued to dete-
riorate and ultimately had to be replaced. In denying that a duty to
defend existed under policy language similar to that now before this
court, the court noted that the roof had been leaking for over four
years before the insurer in question had issued its policies. Conse-
quently, the court believed that no "accident" transpired because
the damage that resulted to the roof was not unusual or unex-
pected.

*Eichelkraut & Sons* and *Bonitz* are distinguishable. The in-
sureds in those cases were given notice of the defect in their work
or product, but through continued acts or omissions, additional
property damage was sustained after the inception of later issued
insurance policies. In contrast, in this case, as Pluswood states,
"there is absolutely no contention that anything Pluswood did, or
did not do, after learning of the alleged defects in its products,
caused, contributed to or exacerbated the property damage which
took place in 1984 and 1985." To the contrary, after Pluswood man-

ufactured and sold the Melaface, it had no control over the progressive deterioration of its Melaface. This total inability to control which of its Melaface, if any, would deteriorate next lessens Pluswood's expectation and distinguishes this case from *Eichelkraut & Sons, Bonitz,* and the other cases the parties have cited. See *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.* (3d Cir. 1982), 676 F.2d 56; *Bartholomew v. Insurance Company of North America* (D. R.I. 1980), 502 F. Supp. 246, *aff'd* (1st Cir. 1981), 655 F.2d 27; *City of Carter Lake v. Aetna Casualty & Surety Co.* (8th Cir. 1979), 604 F.2d 1052.

■ In summary, we reverse the circuit court's conclusion that Pluswood "expected" the property damage prior to the inception dates of the 1984 and 1985 policies. The record reflects that 70% of the property damage which ultimately transpired occurred after the effective dates of those policies. As previously stated, Pluswood cannot be charged with expecting such damage. Moreover, our conclusion is buttressed by the fact that Continental was on notice prior to the 1984 and 1985 policies of the problems its insured was having with its product. Nevertheless, Continental issued the policies without any attempt to exclude or limit coverage for the risks associated with Pluswood's Melaface. If Continental wished to exclude the risk of further liability, it should have acted to specifically exclude it, rather than rely on a court's construction of the term "expected." Accordingly, we reverse the circuit court's determination that no coverage existed under Continental's 1984 and 1985 policies.[1]

■ The second issue before the court involves the interpretation under Wisconsin law of the "sistership" exclusion. Notwithstanding United's contention to the contrary, we find dispositive *Paper Machinery Corp. v. Nelson Foundry Co.* (Wis. App. 1982), 108 Wis. 2d 614, 323 N.W.2d 160. In that case, Paper Machinery, a manufacturer of paper cup-making machines, purchased cast aluminum mandrels from Nelson and incorporated them into its machines. In 1975, the mandrels began cracking while in use and Paper Machinery replaced them as they broke. Paper Machinery sued Nelson for breach of warranty, seeking the cost of investigation of the damage to the mandrels, repair and replacement of the mandrels, lost profits, and damage to good will. After Nelson impleaded

---

[1]No discussion of the endorsement's potential coverage has been provided as a result of the conclusion reached on the first issue.

its insurer, a jury found that Nelson had breached warranties given to Paper Machinery; a joint and several judgment against Nelson and its insurer was later entered.

On appeal, the insurer contended in part that the "sistership" exclusion contained within its policy excluded coverage for all the claims brought against its insured. In rejecting the application of the exclusion, the court stated:

> "Analyzing the exclusion on which Royal Globe relies, it is clear that Paper Machinery has claimed and been awarded 'damages ... for the ... replacement ... of the named insured's [Nelson's] products.' By the plain meaning of the exclusion, however, such damages are excluded from coverage only if the insured's products 'are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.' That is not the situation in this case. Paper Machinery never withdrew the defective mandrels from the market because of known or suspected defect. It replaced customer's mandrels only if and when they broke. We reject Royal Globe's characterization of this replacement as a recall or withdrawal of the mandrels from the market." *Paper Machinery Corp.*, 108 Wis. 2d at 620, 323 N.W.2d at 163.

In an attempt to distinguish *Paper Machinery*, United contends that, in a footnote, the court specifically indicated that no issue was raised before it regarding whether repair and replacement costs of the defective mandrels were covered under the policy. As a result, United contends that *Paper Machinery* is not dispositive because that opinion did not address whether the exclusion excluded repair and replacement costs, the issue with which this court is now faced. We reject this argument.

*Paper Machinery* makes clear that it was interpreting the sistership exclusion as it potentially applied to *all* claims brought by Paper Machinery. The quotation above indicates this much. Moreover, the court specifically noted that the plain meaning it had accorded the exclusion was supported by its historical purpose and the "substantial authority interpreting the identical exclusion." (*Paper Machinery Corp.*, 108 Wis. 2d at 621, 323 N.W.2d at 163-64.) Regarding the exclusion's historical purpose, the court referenced an insurance treatise, which noted that the exclusion only

> " 'denies coverage for claims based on the cost of withdrawing a product from the market, replacing a product or the loss of use of a product which is temporarily or permanently withdrawn from the market because of occurrences involving

the same or similar product. The name derives from an occurrence in the aircraft industry where all airplanes of a certain make and type were grounded by an order of the Civil Aeronautics Administration because one crashed and others were suspected of having a common structural defect. The damages arising out of the loss of use of all sister ships was enormous.

The recall of equipment or parts discovered to have a common fault involve expenses incurred to prevent accidents which have not occurred. While the insurance covers damages for bodily injuries and property damage caused by the product that failed, it was never intended that the insurer would be saddled with the cost of preventing other failures ***.' " (*Paper Machinery Corp.*, 108 Wis. 2d at 621, 323 N.W.2d at 164, quoting 3 R. Long, *The Law of Liability Insurance* App. B, §1 (1981).)

As the above makes clear, the precedential value of *Paper Machinery* is not limited by the court's admitted refusal to address whether repair and replacement costs were covered.

Contrary to United's contention, *American Motorists Insurance Co. v. Trane Co.* (W.D. Wis. 1982), 544 F. Supp. 669, *aff'd* (7th Cir. 1983), 718 F.2d 842, does not require a different result either. In *Trane*, the court, applying Wisconsin law, interpreted an exclusion containing materially different wording. The exclusion there provided that the policy did not apply

"to such part of any damages or expenses which represents the cost of inspecting, repairing, replacing, removing, recovering, withdrawing from use or loss of use of, because of any known or suspected defect or deficiency therein, any

(1) goods or products or any part thereof (including any container) manufactured, sold, handled or distributed by the named insured, or by others trading under his name, or

(2) work completed by or for the named insured; or

(3) other property of which such goods, products or work completed are a component part or ingredient." (*Trane*, 544 F. Supp. at 694.)

Noticeably absent from the above exclusion is the language contained in the sistership exclusion before this court which acts to

limit the exclusion's applicability. The exclusion in this case provides that United's policy does not apply

> "to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the insured's products or work completed by or for the insured or for any property of which such products or work form a part, *if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.*" (Emphasis added.)

The language highlighted above clearly distinguishes the exclusion involved in this case from the exclusion involved in *Trane*. Indeed, the *Trane* court itself noted that the exclusion before it was broader than the typical sistership exclusion now before this court. (*Trane*, 544 F. Supp. at 694.) Accordingly, we affirm the conclusion of the circuit court that the sistership exclusion within United's policy unambiguously fails to preclude coverage.

■ The final issue before the court involves the propriety of summary judgment in light of the discovery posture of this case. During the petition for rehearing before the circuit court, the court indicated that its interpretation of the sistership exclusion was exclusive of the parties' interpretation of the exclusion. Accordingly, neither United's nor Pluswood's interpretation of the exclusion, or their intent pertaining to it, was relevant to the court; its meaning was derived solely from the plain language contained within it. Moreover, the court had before it a copy of the pleadings in the New York litigation. Therefore, it could determine for itself the nature of the relief sought. As a result, Pluswood's responses to United's request to admit as they may pertain to the relief sought in the New York litigation has no bearing on Pluswood's summary judgment motion. Accordingly, we reject United's argument.

In summary, we reverse the circuit court's conclusion that under Continental's 1984 and 1985 policies, Pluswood expected the property damage that transpired during those years. However, we affirm the circuit court's interpretation of the sistership exclusion and its refusal to modify the summary judgment based on discovery grounds.

Affirmed in part; reversed in part.

CAMPBELL and O'CONNOR, JJ., concur.