168 Wis.2d 390 (1992)
484 N.W.2d 314
SCHOOL DISTRICT OF SHOREWOOD, a school district, Plaintiff-Appellant,
v.
WAUSAU INSURANCE COMPANIES,[] an insurance corporation, and Continental Casualty Company,[] a foreign corporation, Defendant-Respondents.
SCHOOL DISTRICT OF GREENFIELD,[] a school district, Plaintiff-Appellant,
v.
WAUSAU INSURANCE COMPANIES, an insurance corporation, and U.S. Fire Insurance Company,[] a foreign corporation, Defendants-Respondents.
Nos. 90-1440, 90-1707.
Supreme Court of Wisconsin.
Oral argument November 26, 1991.
Decided May 20, 1992.
*397 For the plaintiffs-appellants, there was a brief by Warren L. Kreunen, Timothy G. Dugan, and von Briesen & Purtell, S.C. and oral argument by Mr. Dugan.
For the defendant-respondent, Continental Casualty Company, there were brief by Edward A. Hannan, M. Susan Maloney, Marjorie M. Greene and Godfrey, Trump and Hayes, Milwaukee and oral argument by Mr. Hannan.
For the defendant-respondent, Wausau Insurance Companies, there were briefs (in the Court of Appeals) by James G. Doyle, Paul J. Kelly and Schellinger & Doyle, Brookfield and oral argument by Mr. Kelly.
For the defendant-respondent, U.S. Fire Insurance Company, there were briefs (in the Court of Appeals) by John M. Swietlik, John E. Cain and Kasdorf, Lewis & Swietlik, S.C., Milwaukee and oral argument by Mr. Swietlik.
*398 Amicus Curiae brief was filed by Charles H. Bohl, Tamara A. Hayes, and Frisch Dudek, Ltd., Milwaukee for Wisconsin Counties Association.
SHIRLEY S. ABRAHAMSON, J.
This is an appeal from judgments of the circuit court for Milwaukee County, Victor Manian, Circuit Judge, granting the insurance carriers' motions for summary and declaratory judgment and denying the school districts' motions for summary and declaratory judgment.
These cases center on the term "damages" as that term is used in insurance policies promising to pay sums that the insureds are "legally obligated to pay as damages." The circuit court held that complaints alleging racial discrimination and seeking declaratory, injunctive and remedial relief and attorney fees do not constitute actions for "damages" within the policies.
This court accepted the appeal on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats. The court of appeals described the issues as follows: (1) whether costs of compliance incurred by an insured in a civil rights action seeking only injunctive relief constitute "damages," and (2) whether in a civil rights action attorney fees and costs under 42 U.S.C. sec. 1988 constitute "damages."
For the reasons set forth, we conclude that the insurance policies, in providing for reimbursement of "all sums which the insured shall become legally obligated to pay as damages," required the insurance carriers to defend the underlying racial discrimination litigation seeking declaratory, injunctive and remedial relief and to reimburse the two school districts for their own attorney fees incurred in defending the underlying litigation. We further conclude that the insurance carriers must reimburse the school districts for expenditures incurred in *399 abiding by the terms of the settlement agreement. These expenditures include funding programs to remedy alleged discrimination and paying the attorney fees for the lawyers representing an opposing party. Accordingly we reverse the judgments dismissing the school districts' complaints. We remand the cause to the circuit court to grant the school districts' motions for summary judgment on the issue of the insurance carriers' obligation to defend the two school districts in the underlying litigation. On remand the circuit court must determine the amount due under the policies to reimburse the school districts for their own attorney fees and for the expenditures incurred in abiding by the terms of the settlement agreement.
We shall first state the facts. We shall then discuss (1) whether the allegations of racial discrimination in the underlying litigation fall within the scope of the insurance policies; (2) whether the declaratory, injunctive and remedial relief sought in the underlying litigation constitutes "damages" within the school districts' insurance policies, thereby imposing on the insurance carriers a duty to defend and indemnify the insured; and finally (3) whether the opposing parties' attorney fees sought from the school districts in the underlying litigation constitute "damages" within the policies.

I.
In their motions for summary judgment, no party asserted a disputed issue of material fact. The interpretation of insurance policies issued by Continental Casualty Company, Wausau Insurance Companies and United States Fire Insurance Company is in dispute. The school district of Greenfield claims coverage under four one-year policies issued by U.S. Fire covering the *400 periods from July 1, 1978 to July 1, 1981 and July 1, 1983 to July 1, 1984; three one-year combination casualty policies issued by Wausau covering the period from July 1, 1981 to July 1, 1984; and one one-year umbrella policy issued by Wausau covering the period from July 1, 1981 to July 1, 1982. The school district of Shorewood claims coverage under four one-year policies issued by Continental Casualty covering the period from July 1, 1977 to July 1, 1981; and six one-year umbrella policies issued by Wausau covering the period from July 1, 1981 to July 1, 1987.
For purposes of this appeal, the insurance policies provide essentially identical coverage and the same duty to defend. The policies obligate the insurance carriers to pay all sums, within the amount of coverage provided by the policy, "which the insured shall become legally obligated to pay as damages" because of "personal injury" or "discrimination injury" covered by the policies.[1] *401 (Emphasis added.) The policies define "personal injury" or "discrimination injury" to include only discrimination that is "neither expected nor intended" by the insured or discrimination that is not "committed by, at the direction of, or with consent of the insured."[2]
*402 The insurance carriers also obligated themselves, for injuries covered by a policy, to "defend any suit against the insured alleging such injury . . . and seeking damages on account thereof, even if such suit is groundless, false or fraudulent."[3]
In the underlying federal racial discrimination litigation, Board of School Directors of the City of Milwaukee v. State of Wisconsin, No. 84-C-0877 (E.D. Wis., *403 filed July 26, 1984), the school districts of Shorewood and Greenfield were named as defendants, along with 22 other suburban school districts, the State of Wisconsin, and several state agencies and officers. The Board of School Directors of the City of Milwaukee (Milwaukee Board) and two of its members and their children brought the suit seeking to remedy allegedly illegal racial segregation and inequality of educational opportunity in the Milwaukee metropolitan area. The National Association for the Advancement of Colored People (NAACP) was permitted to intervene as a plaintiff and the court certified the litigation as a class action.
The amended complaint included a request for declaratory, injunctive and remedial relief, stated as follows:
1. This complaint request declaratory and injunctive relief to redress the deprivation under color of state law of the rights, privileges, and immunities secured by the Constitutions and laws of the United States and the State of Wisconsin to the plaintiffs and the schoolchildren of the City of Milwaukee. It seeks to remedy the illegal racial segregation and the resulting inequality of educational opportunity and metropolitan-wide racially dual structure of education created and maintained by defendants in the Milwaukee metropolitan area.
The amended complaint alleged that the school districts intentionally participated in interdistrict and intradistrict constitutional violations that "reinforced racial isolation in the Milwaukee metropolitan area." The amended complaint further stated that the suburban school districts were joined in the litigation because they were "affected by" the constitutional violations of the state and its agencies and therefore the school districts' participation was necessary to any adequate remedy. *404 According to the Milwaukee Board, the conduct of the school districts, the state, and its agencies allegedly violated the Thirteenth and Fourteenth Amendments of the United States Constitution; the Supremacy Clause of the United States Constitution, art. IV, clause 2; 42 U.S.C. secs. 1981, 1983, 1985, and 2000d; art. I, sec. 1 and art. X, sec. 3 of the Wisconsin Constitution; and secs. 116.51(2)[4] and 118.13, Wis. Stats. 1981-82.
Claiming no adequate remedy available at law, the Milwaukee Board prayed for declaratory, injunctive and remedial relief, costs and attorney fees, and whatever other relief the court found just and proper. The prayer for relief in the amended complaint stated:
WHEREFORE, plaintiff Milwaukee Board respectfully requests that [the] Court:
(a) enter an order . . . declaring that defendants and their predecessors created, maintained, and continue to perpetuate a racially dual structure of public education throughout the Milwaukee metropolitan area in violation of the Fourteenth Amendment to the Constitution of the United States, the Constitution of the State of Wisconsin, and federal and State law;
(b) enter an order requiring the defendants . . . to cease their illegal and unconstitutional conduct and to implement a plan to correct the constitutional violations referred to above. . . . The plan should include the reorganization and consolidation of school districts; the establishment of magnet schools; the nondiscriminatory school assignment and transportation of pupils to reduce racial segregation; the desegregation of faculty and staff; procedures for nondiscrimination in classroom and program assignments and in discipline; compensatory programs to *405 overcome the effects of past discrimination; exemptions from mandatory transportation of pupils for racially integrated neighborhoods; the provision of bilingual education for limited and non-English speaking students as necessary; and such other provisions and programs as are needed to eliminate the remaining vestiges of segregation in the school districts and schools in the Milwaukee metropolitan area. . . .
(c) enter an order pursuant to 42 U.S.C. § 1988 allowing plaintiffs their costs and reasonable attorneys' fees in prosecuting this complaint; and
(d) grant such other and further relief as the Court finds just and proper.
The Greenfield and Shorewood school districts notified their respective insurance carriers of the underlying litigation and tendered the defense of the suit to the insurers. The insurance carriers refused to defend the two school districts in the underlying litigation on the ground that the claims did not fall within the insurance policies. The two school districts engaged their own legal counsel and eventually entered into a settlement agreement with the plaintiffs.
In the settlement agreement, the parties expressly recognized that the state and the school districts continue to deny the violation of any constitutional rights and that the agreement did not constitute an admission: "The parties recognize that the defendants have denied and continue to deny that they or their predecessors have violated the constitutional rights of any student . . .. [E]ntry into this Agreement shall not constitute an admission by any party."
The agreement provided for the establishment of numerous programs, committees, and offices. First, the school districts agreed to use their best efforts to fill a greater number of seats with interdistrict transfer students. *406 The school districts would be reimbursed under sec. 121.85 Wis. Stats., for the excess costs involved in this undertaking, including transportation costs. Second, the settlement agreement provided for the establishment of a Coordinating Council to conduct minority recruitment and training programs and coordinate the student transfer program. Expenditures for the Coordinating Council would be shared between the Milwaukee Board and the other school districts. Third, each school district agreed to make a good faith effort to seek and hire minorities by adopting a minority recruitment plan. Fourth, the settlement agreement provided for the establishment of a Minority Employment Recruiting Office (MERO). The MERO would be maintained by the Milwaukee Board and by those school districts that elect to participate in MERO as part of their own minority recruitment plan. Fifth, as part of the settlement agreement, the school districts agreed to pay the sum of $225,000 to the NAACP for its attorney fees and expenses. The remaining provisions of the settlement agreement involved administrative matters which did not call for an expenditure of money by the school districts.
In compliance with the settlement agreement, the Greenfield and Shorewood school districts paid $3,315 and $2,038 respectively as their proportionate shares of the NAACP's attorney fees. From 1988-90, the Greenfield school district paid $10,378 to fund the MERO and $16,095 to fund the Coordinating Council. During the same time period the Shorewood school district paid $7,692 to fund the MERO and $11,910 to fund the Coordinating Council. Both school districts continue to contribute annually to these programs. In addition, the Greenfield and Shorewood school districts paid $411,594 *407 and $251,074 respectively in attorney fees to defend themselves in the underlying litigation.
The two school districts initiated separate actions against their respective insurance carriers to recover attorney fees and expenses incurred in defending themselves in the underlying litigation and monies expended to comply with the settlement agreement. After the two cases were consolidated each school district and insurance company moved for summary judgment in its favor. The circuit court held that the declaratory, injunctive and remedial relief sought in the underlying litigation did not constitute a claim for "damages" under the insurance policies. Further, the circuit court held that the funds the two school districts had paid to an opposing party for attorney fees under the settlement agreement were costs, not "damages" under the insurance policies. Accordingly the circuit court concluded that the insurance carriers need not have defended the suit on behalf of the school districts and need not reimburse the school districts for any of these expenditures. The circuit court granted the insurance carriers' motions for summary judgment, denied the school districts' motions and dismissed the school districts' complaints.
The school districts appealed the judgments of the circuit court to the court of appeals and we accepted that court's certification.
[1, 2]
In filing their motions for summary judgment, no party asserted any material issues of fact. Therefore, under the standards set forth in sec. 802.08(2), Stats. 1989-90, we need only review whether "the moving party is entitled to a judgment as a matter of law." In the absence of extrinsic evidence, the interpretation of insurance policies is a question of law which this court *408 decides independently of the decisions of the lower courts.

II.
The two school districts assert that the allegations of discrimination in the underlying amended complaint fall within the scope of the insurance policies. Therefore, they maintain that the insurance carriers had a duty to defend. The insurance policies at issue provide coverage for acts of discrimination unless the acts are "expected or intended" by the insured or "committed by, at the direction of, or with the consent of" the insured. The insurance carriers contend that the underlying amended complaint alleges only intentional discrimination, which is expressly excluded from coverage.
[3, 4]
An insurance carrier's duty to defend an insured in a third-party suit is predicated on the allegations in a complaint which, if proved, would give rise to recovery under the terms and conditions of the insurance policy. Sola Basic Industries, Inc. v. U.S. Fidelity & Guaranty Co., 90 Wis. 2d 641, 646, 280 N.W.2d 211 (1979); Grieb v. Citizens Casualty Co., 33 Wis. 2d 552, 557-58, 148 N.W.2d 103 (1967). Insurance carriers should not be required to defend an insured in a suit in which they have no economic interest. John Alan Appleman, Insurance Law and Practice sec. 4683, at 53 (Berdal ed. 1979). Therefore the court must compare the complaint with the insurance policies and determine whether, if the allegations in the complaint are proved, the insurance carriers would be required to pay the resulting judgment.
[5-7]
The duty to defend depends on the nature of the claim alleged in the complaint, not on the merits of the *409 claim. An insurance carrier agrees to defend even if the allegations in the suit are "groundless, false or fraudulent." Grieb, 33 Wis. 2d at 558. If there is any doubt about the duty to defend, the doubt must be resolved in favor of the insured. Sola, 90 Wis. 2d at 646-47.
The amended complaint alleges facts to support a finding that the two school districts were "affected by" the discriminatory conduct of other governmental entities including the state of Wisconsin. The federal courts have required school districts to participate in desegregation remedies when the districts do not themselves cause the discriminatory effects but are merely affected by the discrimination of other governmental entities. In a case examining interdistrict school segregation in Indianapolis, the Seventh Circuit Court of Appeals wrote that "if state discriminatory housing practices have a substantial interdistrict effect, it is appropriate to require school authorities to remedy the effects even though they did not themselves cause this aspect of school segregation." United States v. Board of School Commissioners, 573 F.2d 400, 410 (7th Cir.), cert. denied, 439 U.S. 824 (1978) (citing Milliken v. Bradley, 418 U.S. 717, 744-45 (1974)).
Thus the two school districts might be subject to liability even though they did not expect, intend, commit, direct, or consent to the alleged discrimination. Therefore, we conclude that if the allegations in the complaint were proved they could give rise to liability within the coverage of the insurance policies.
[8, 9]
The amended complaint in the underlying litigation contained other allegations that may fall outside the coverage provided by the insurance policies. Nevertheless the insurance carriers are obligated to defend the entire litigation if the complaint may give rise to liability covered *410 under the policies.[5] See United Nat'l Ins. Co. v. Entertainment Group, Inc., 945 F.2d 210, 212 (7th Cir. 1991) (applying Illinois law); Annotations, Allegations in Third Person's Action Against Insured as Determining Liability Insurer's Duty to Defend, 50 A.L.R.2d 458 (1956). We therefore conclude that the allegations of discrimination in the amended complaint fall within the coverage of the policies.

III.
Even though the insurance policies provide coverage for discriminatory conduct alleged in the amended complaint, the insurance carriers would have no obligation to defend the school districts unless the amended complaint prayed for relief compensable under the policies. In the amended complaint, the Milwaukee Board sought declaratory, injunctive and remedial relief; the Milwaukee Board sought implementation of a remedial plan to correct and overcome the alleged constitutional violations.
The insurance carriers assert that the underlying litigation does not seek damages as the term "damages" is used in the policies and that accordingly they need not have defended the school districts in the underlying litigation nor reimburse the school districts for the expenditures incurred to comply with the settlement agreement.
The insurance policies at issue do not define the term "damages." The policies oblige the insurers to pay on behalf of the two school districts "all sums which the insured shall become legally obligated to pay as damages." *411 (Emphasis added.) This damages clause is standard language appearing in many liability insurance policies.
The school districts and the insurance carriers cite numerous cases to support their respective positions about the meaning of the term "damages" in insurance policies.[6]
The insurance carriers urge us to adopt a "technical" meaning of the term "damages" in the policies and espouse the definition appearing in Black's Law Dictionary 389 (6th ed. 1990). This definition limits damages to compensatory damages as follows:
A pecuniary compensation or indemnity which may be recovered in the courts by any person who has suffered loss, detriment or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another.
The insurance carriers argue that the term "damages" as used in these insurance policies means compensation for past wrongs or injuries, is generally pecuniary in nature, and does not encompass the cost of complying with an injunctive decree. The insurance carriers conclude that no reasonable basis exists for holding that expenditures incurred by the two school districts to comply with the relief demanded in the amended complaint *412 are sums payable as "damages" for purposes of the insurance policies.
Several decisions support the insurance carriers' interpretation of the term "damages." For instance, in Desrochers v. New York Casualty Co., 106 A.2d 196 (N.H. 1954), the insured filled a marshy area causing flooding on a neighboring property. In the underlying litigation, the trial court awarded $200 to the neighboring property owner as compensation for the damages already suffered and ordered the insured to remove the obstruction from the insured's property. Interpreting the same "damages" clause as appears in the insurance policies in the case at bar, the New Hampshire Supreme Court concluded that the insurer was obligated to reimburse the insured for the $200 award but not for the cost of complying with the mandatory injunction. The Desrochers opinion distinguishes between monetary obligations the court imposed on a party to compensate for past harm (which the court labelled damages) and monetary obligations incurred to comply with a mandatory injunction to prevent future harm (which the court concluded do not constitute damages). The court wrote:
The cost of compliance with the mandatory injunction is not reasonably to be regarded as a sum payable "as damages." Damages are recompense for injuries sustained. They are remedial rather than preventive, and in the usual sense are pecuniary in nature. The expense of restoring the plaintiff's property to its former state will not remedy the injury previously done, nor will it be paid to the injured parties.
Desrochers, 206 A.2d at 198 (citations omitted).
Similarly, in Aetna Casualty and Surety Co. v. Hanna, 224 F.2d 499 (5th Cir. 1955), the federal court of *413 appeals denied insurance coverage for expenditures the insured incurred in complying with a court order to remove debris encroaching on neighboring property and to construct a bulkhead to prevent future encroachment. Relying on the Black's Law Dictionary definition of damages quoted above, the court concluded that an unsuccessful litigant's expenditures to comply with an injunctive decree do not constitute damages under the policy. Aetna, 224 F.2d at 503.[7]
We are not persuaded by this line of argument for several reasons.
[10]
First, if we were to adopt a "technical" meaning of the term "damages" in the policies, we would be abandoning the court's long-standing rules for construing insurance policies and would be adopting a new rule of construction. This court's long-standing rules for construing insurance policies are as follows: (1) Give effect to the intentions of the parties. (2) Give meaning to each word and phrase in the policy. (3) Give words in the policy the common and ordinary meaning they would have in the mind of a lay person. (4) Construe words in *414 the policy to give effect to what a reasonable person in the position of the insured intended the words to mean, not what the insurer intended the words to mean. (5) Resolve ambiguity in favor of the insured. (6) Where no ambiguity exists in the policy language, do not engage in construction but merely apply the policy terms.[8]
[11]
In construing the insurance policies in this case and deciding on the meaning of the term "damages," the court should follow its existing rules of construction. In doing so, we adopt an interpretation of the term "damages" consistent with the ordinary usage of the term. We also consider the reasonable expectation of a party in the position of the insured.
Webster's Third New International Dictionary gives a broader meaning to the term "damages" than does the technical definition the insurance carriers urge. According to Webster's, "damages" means "the estimated reparation in money for detriment or injury sustained; compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." From the viewpoint of the lay insured, the term as thus defined could reasonably include all monetary relief necessary to remedy a legal wrong.
*415 [12, 13]
Applying the ordinary usage of the term "damages," we conclude that "damages" includes expenditures of the two school districts to comply with injunctive or equitable relief. Damages does not depend on the nature of the relief sought but on the use of the legal system to compel the policyholder to make a payment or to take certain action.
[14]
Furthermore, considering the reasonable expectation of parties in the position of the school districts in this case, we conclude that the policies covered injunctive relief. After all, the relief granted in discrimination cases is often mandatory injunctive relief.[9] Without an express exclusion in the policies, it is difficult to imagine how the school districts could reasonably expect that coverage in discrimination actions would be limited to reimbursement for past harms. The insurance carriers seem to be asking the court to rewrite the policies to free them from a risk which the school districts contemplated and which the insurance carriers have been paid to assume.
[15, 16]
Second, if we were to adopt the technical interpretation urged by the insurance carriers, we would be adopting the distinction between suits at law and suits in equity for interpreting the damages clause in insurance policies. The insurance carriers argue that damages is a *416 legal remedy, to compensate for past injuries, and that mandatory injunction is an equitable remedy, operating prospectively to prevent future harm. Although the main purpose of "damages" at law is generally viewed as compensatory, the damages remedy is not wholly compensatory. At the same time, mandatory injunctive relief may also be "compensatory" in nature. Dan Dobbs, Handbook on the Law of Remedies, sec. 1.1 at 1 (1973); Milliken v. Bradley, 433 U.S. 267, 290 (1977). We are unwilling to rest a definition of the term "damages" in insurance policies on the legal-equitable distinction which has long been abandoned for most purposes[10] and is seldom relied upon in the legal profession (let alone by those who buy and sell insurance).
[17, 18]
Third, the insurance carriers' argument that the term "damages" in the insurance policies is limited to compensation for past wrongs is not supported by Wisconsin cases. Our insurance cases hold that "damages," when used in insurance policies substantially similar to the ones in this case, includes more than legal compensation for past wrongs or injuries. In Brown v. Maxey, 124 Wis. 2d 426, 441-43, 369 N.W.2d 677 (1985), interpreting the same "damages" provision as the one at issue in the case at bar, this court construed the insurer's liability for damages to include reimbursement for punitive damages paid by the insured, even though this court has acknowledged that "punitive damages are not awarded to compensate the plaintiff for the loss sustained." Fahrenberg v. Tengel, 96 Wis. 2d 211, 234, 291 N.W.2d 516 (1980). Our cases recognize that the purposes of punitive damages are punishment of the tortfeasor and deterrence. Lisowski v. Chenenoff, 37 Wis. 2d 610, 633, *417 155 N.W.2d 619 (1968); Kink v. Combs, 28 Wis. 2d 65, 80, 81, 135 N.W.2d 289 (1965); Restatement of Torts (Second), sec. 908, Comment a (1977). The court concluded that the reasoning applied in Cieslewicz was applicable to the Maxey case.
In Cieslewicz v. Mutual Service Casualty Insurance Company, 84 Wis. 2d 91, 267 N.W.2d 595 (1978), also interpreting the same "damages" provision in an insurance policy, this court held that an insurer must reimburse the insured for payment of statutory treble damages. The court wrote that statutory treble damages do not serve to compensate a party for actual past losses. Rather, like common law punitive damages, they aim to punish the wrongdoer beyond the actual harm caused and to deter others from similar harmful conduct in the future. Nevertheless the courts have decided that statutory treble damages fall within the policy terms. Cieslewicz, 84 Wis. 2d at 99, 100. "A reasonable person in the position of the insured," wrote the court, "could believe that the language of the policy provides coverage against all civil liability arising out of an occurrence resulting in bodily injury." Cieslewicz, 84 Wis. 2d at 98.[11]
The insurance carriers have not explained why punitive and treble statutory damages (both of which are *418 not compensatory) constitute "damages" within the policies, yet the monetary sums awarded in this case (which are designed to remedy the alleged discrimination) do not constitute "damages."
The only Wisconsin case that might arguably support the insurance carriers' interpretation of "damages" is Fee v. Heritage Mutual Insurance Co., 17 Wis. 2d 364, 117 N.W.2d 269 (1962), overruled on other grounds, In re Estate of Stromstead, 99 Wis. 2d 136, 299 N.W.2d 226 (1980). Fee turns to the Black's Law Dictionary technical definition of "damages" supported by the insurance companies and quoted above. Yet the Fee case is significantly different from this case and has no application here. The court in Fee does not use the technical definition of damages, as the insurance carriers do, to distinguish remedies for past wrongs from money paid to comply with an injunctive order.
Like the insurance policies presently before the court, the automobile liability insurance policy covering Mr. Fee, the plaintiff, stated that the insurance company would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . .." 17 Wis. 2d at 365. Mrs. Fee had been injured in an automobile accident. Mr. Fee recovered 90 percent of her medical expenses from the driver of the other car; he did not recover 10 percent of the medical expenses because of Mrs. Fee's causal negligence. Mr. Fee then sued his own automobile liability insurance company under his auto policy asserting that it should pay the 10 percent because this sum was damages he, the insured, was legally obligated to pay.
The Fee court concluded that the law imposed a duty on the husband to support his wife, including furnishing medical care, but this duty did not constitute damages. Mr. Fee, wrote the court, was not legally obligated *419 to pay Mrs. Fee's medical expenses as damages; he paid them under his marital duty to support. Thus, concluded the court, Mr. Fee cannot recover those sums under his insurance policy that reimburses him only for damages resulting from litigation.
Mr. Fee could recover as damages his wife's medical expenses from the driver who is legally responsible for the injury that necessitated the medical expense. As between the driver tortfeasor and the tortfeasor's insurance company, the victim's medical expenses were damages covered by that auto policy. As between Mr. Fee, not a tortfeasor, and his automobile liability insurance company, the medical expenses for Mrs. Fee were not damages that Mr. Fee was obligated to pay as a result of his being a tortfeasor.
In this case, unlike in the Fee case, the insureds (the school districts) are the "tortfeasors"; the policies cover the insureds' conduct; the insureds are legally obligated under court order to pay for conduct covered under the policies.
[19]
The insurance carriers also argue that an interpretation of the policies granting coverage in this case would render the words "as damages" superfluous in the insurance policies, because the insurance carriers would have to reimburse the insured for any sums the insured was obligated to pay. We do not agree with the carriers' position. The words "as damages" distinguish legal obligations arising from the underlying litigation from other legal obligations, such as the marital duty to support a spouse distinguished above in the Fee case.
[20]
For the reasons set forth, we conclude that the amended complaint in the underlying litigation stated a cause of action which, if proved, would constitute "discrimination" *420 under the insurance policies at issue. Furthermore, we conclude that the injunctive, declaratory and remedial relief demanded in the amended complaint constitute "damages" under the policy. We therefore hold that the insurance carriers were obligated to defend the two school districts in the underlying litigation and to reimburse them for expenditures incurred in funding programs to remedy the alleged discrimination, as required by the settlement agreement.

IV.
The court must next determine whether attorney fees for the lawyers representing an opposing party in the underlying litigation, as requested in the amended complaint under 42 U.S.C. sec. 1988, constitutes "damages" under the policies. The two school districts argue that the insurance carriers had a duty to defend them because the attorney fees requested in the amended complaint constitute "damages" under the policies. They also assert that the insurance carriers must reimburse them for the attorney fees paid to the NAACP pursuant to the settlement agreement.
[21]
Under the American rule, attorney fees are generally not awarded to a prevailing party in a lawsuit unless authorized by statute or enforceable contract. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247 (1975). The federal statute applicable to the underlying litigation, 42 U.S.C. sec. 1988, explicitly provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."[12]
*421 [22]
The insurance carriers argue that, because sec. 1988 refers to attorney fees as "costs," they are not "damages" under the policies. We are not persuaded by this argument. Numerous statutes allow an award of attorney fees to the prevailing party. Some statutes delineate attorney fees as an element of the costs, while others treat the fees apart from costs, without any explanation for the different terminology.[13] Under these circumstances, the statutory characterization of attorney fees as costs is not conclusive for purposes of interpreting insurance policies. We must look beyond the word "costs" in the statute.
The insurance carriers rely on Board of County Commissioners of the County of Larimer v. Guarantee Ins. Co., 90 F.R.D. 405 (D. Colo. 1981), in which the county was a defendant in a civil rights action and sought indemnification from its insurer for the payment of attorney fees awarded pursuant to 42 U.S.C. sec. 1988. Similar to the present situation, the underlying complaint sought only declaratory and injunctive relief and the insurance policy provided coverage for "all sums which the insured shall become legally obligated to pay as damages because of injury." The Larimer court held that attorney fees "awarded and costs assessed are not damages as contemplated by the [insurance] policy definition or as understood by the term's ordinary customary *422 meaning in civil rights actions." Larimer, 90 F.R.D. at 407. According to Larimer, attorney fees the insured pays to the opposing party under sec. 1988 are "costs" of litigation, not damages under the policy.
The school districts rely on City of Ypsilanti v. Appalachian Insurance Co., 547 F. Supp. 823 (E.D. Mich. 1982), aff'd, 725 F.2d 682 (6th Cir. 1983). In Ypsilanti, the complainant in the underlying lawsuit alleged selective and discriminatory enforcement of city housing and zoning ordinances by the city and its officers. The district court described the underlying lawsuit as a civil rights suit but did not cite 42 U.S.C. sec. 1988. The court addressed the issue of whether the insurance policy, which agreed to pay "all sums which the Insured shall become legally obligated to pay as damages," covered the award of attorney fees assessed against the city in the underlying litigation.
The district court in Ypsilanti applied the canons of construction of insurance policies. Citing our Cieslewicz opinion concerning punitive damages, 84 Wis. 2d 91, 267 N.W.2d 595 (1978), the district court concluded that "a reasonable person in the position of the Insured would believe that the words `all sums which the insured shall become legally obligated to pay as damages' would provide coverage for all forms of civil liability, including attorney fees." Ypsilanti, 547 F. Supp. at 828. The district court held that in a civil rights suit, attorney fees are a form of damages which the insurer contracted to cover, stating "It would have been simple enough to exclude attorney fee awards had the parties so intended." 547 F. Supp. at 828.
The Ypsilanti district court also concluded that attorney fees awarded in the underlying litigation do not constitute "costs" under the insurance policy. "Costs" were "sketchily defined [in the insurance policy] as *423 `investigations, adjustment and legal expenses.'" 547 F. Supp. at 827. The district court concluded that the word "costs" as used in the policy refers only to the expense of carrying on the defense of a lawsuit, not to sums for which the insured is found liable such as an award of attorney fees. 547 F. Supp at 827. The district court concluded in Ypsilanti that attorney fees for the lawyers representing the opposing party must be considered "damages" under the insurance policy in issue in that case.
[23]
We find the reasoning of Ypsilanti more persuasive than that of Larimer. The term "damages," according to its ordinary usage, includes all forms of civil liability, including attorney fees. Under the insurance policies, the school districts had a reasonable expectation of recovering from the insurance carriers any attorney fees they became obligated to pay to an opposing party. The award of attorney fees is one of the "arsenal of remedies available to combat violations of civil rights," Evans v. Jeff D., 475 U.S. 717, 732 (1986).
[24]
We conclude that attorney fees paid to an opposing party in a discrimination case, like the injunctive relief we discussed previously, falls under the term "damages." The insurance carriers thus had a duty to defend the school districts in the underlying litigation for conduct covered by the policies that resulted in a request for attorney fees under 42 U.S.C. sec. 1988.
The federal district court's Settlement Order in the underlying litigation declared that none of the settling parties is a prevailing party under sec. 1988 and that all settling parties waived their rights to apply for any *424 award of fees under sec. 1988.[14] The Settlement Order also acknowledged that certain parties, "to induce settlement," agreed to reimburse the NAACP the sum of $225,000 for fees and expenses including attorney fees. The district court approved this reimbursement as reasonable, as it would attorney fees under sec. 1988.
The United States Supreme Court has recognized that an agreement between the parties to a civil rights action about attorney fees in return for the waiver of the right to attorney fees under sec. 1988 may greatly promote settlement. The amount of fees awarded under sec. 1988 is subject to uncertainty. "[M]any a defendant would be unwilling to make a binding settlement offer on terms that left it exposed to liability for attorney's fees in whatever amount the court might fix on motion of the plaintiff." Chesny v. Marek, 720 F.2d 474, 477 (7th Cir. 1983), quoted with approval, Marek v. Chesny, 473 U.S. 1, 7 (1985). See also Evans v. Jeff D., 475 U.S. at 730-38.
[25]
The settlement agreement relating to the NAACP's attorney fees in the case at bar is apparently the equivalent of attorney fees awarded to the prevailing party under 42 U.S.C. sec. 1988 had the case not been settled. We therefore conclude that the insurance policies cover the attorney fees paid to the NAACP by the school districts pursuant to the settlement agreement.
For the reasons set forth, we conclude that the insurance policies, in providing for reimbursement of "all sums which the insured shall become legally obligated to pay as damages," required the insurance carriers to defend the underlying racial discrimination litigation *425 seeking declaratory, injunctive and remedial relief and to reimburse the two school districts for their own attorney fees incurred in defending the underlying litigation. We further conclude that the insurance carriers must reimburse the school districts for expenditures incurred in abiding by the terms of the settlement agreement. These expenditures include funding programs to remedy alleged discrimination and paying the attorney fees for the lawyers representing an opposing party. Accordingly we reverse the judgments dismissing the school districts' complaints. We remand the cause to the circuit court to grant the school districts' motions for summary judgment on the issue of the insurance carriers' obligation to defend the two school districts in the underlying litigation. On remand the circuit court must determine the amount due under the policies to reimburse the school districts for their own attorney fees and for the expenditures incurred in abiding by the terms of the settlement agreement.
By the Court.The judgments of the circuit court are reversed and the cause remanded.
CALLOW, WILLIAM G., J. (dissenting).
The relevant insurance policies at issue generally provide that the insurers shall pay "all sums which the insured shall become legally obligated to pay as damages" (emphasis added). The term "damages" is left undefined by the insurance policies. The majority, therefore, applies "the common and ordinary meaning" of the term "damages" and concludes that the term, as used in a contract of insurance, encompasses the cost of complying with injunctive relief and attorney fees sought by an opposing party as part of the costs in the underlying litigation.
In the insurance context, the term "damages" has an accepted technical meaning in the law, which does *426 not include the cost of complying with injunctive relief nor attorney fees sought by an opposing party as part of the costs of the underlying litigation. Accordingly, I dissent.
The standards for the construction of terms in insurance policies are well-established and have been stated by this court on several occasions:
Contracts of insurance are controlled by the same principles of law that are applicable to other contracts. A policy of insurance like any other contract is to be construed so as to give effect to the intention of the parties. In the case of an insurance contract, the words are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of an insured would have understood the words to mean. Whatever ambiguity exists in a contract of insurance is resolved in favor of the insured. . . . Words or phrases in a contract are ambiguous when they are reasonably or fairly susceptible to more than one construction.
Caporali v. Washington Nat. Ins. Co., 102 Wis. 2d 669, 675-76, 307 N.W.2d 218 (1981) (quoting Garriquenc v. Love, 67 Wis. 2d 130, 134-35, 226 N.W.2d 414 (1975)). However, when the terms of the policy are unambiguous and plain on their face, the policy should not be rewritten to include insurance coverage not agreed to by the parties and for which it was not paid. Mercado v. Mitchell, 83 Wis. 2d 17, 25, 264 N.W.2d 532 (1978).
On past occasions, we have resorted to the dictionary for guidance in discerning the ordinary meaning of terms in a contract.[1] However, in the insurance context, the term "damages" has an accepted technical meaning *427 in law.[2] Black's Law Dictionary (6th ed.) p. 389, defines "damages" as:
A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act of omission or negligence of another.
"Damages" as used in these insurance policies unambiguously means legal damages. It is legal compensation for past wrongs or injuries and is generally pecuniary in nature. The term "damages" does not encompass the cost of complying with injunctive relief.[3]
*428 A noted authority on remedies explains that judicial remedies fall into four major categories: damages remedies, restitutionary remedies, coercive remedies (such as injunctions that are backed by the court's contempt power), and declaratory remedies. Dobbs, Handbook on the Law of Remedies, sec. 1.1 at 1 (1973). This classification scheme is based on the nature and purpose of the relief awarded. Id. at 2.
The damages award is substitutionary relief, that is, it gives the plaintiff money mainly by way of compensation, to make up for some loss, but one ordinarily may be measured in money. . . . By way of contrast, specific remedies in law or equity, such as replevin and ejectment at law, or injunction or specific performance in equity, are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled. *429 Dobbs, sec. 3.1 at 135 (footnotes omitted) (emphasis added). A classification based on the form of the action, as either equitable or legal, is irrelevant. Where the parties have contracted to limit recovery to a specific quantifiable type of remedy, a court should not alter the insurance contract to include other types of remedies not contracted for by the parties and that may not be presently quantifiable.
This limited construction of the term "damages" is consistent with the core distinction between damages and injunctive relief, which was explained in Pure Milk Prod. Coop. v. National Farmers Org. (Pure Milk II), 90 Wis. 2d 781, 280 N.W.2d 691 (1979). Pure Milk II involved the appropriateness of a permanent injunction to prevent the National Farmers Organization from attempting to induce members of Pure Milk Products Cooperative and Associated Milk Producers, Inc. to breach their membership and marketing agreements. In Pure Milk II, we explained:
[A]n injunction is designed to prevent injury, not to compensate for past wrongs, and that an injunction may issue merely upon proof of a sufficient threat of future irreparable injury.
Pure Milk II, 90 Wis. 2d at 802. An injunction looks to the future conduct of the parties and is preventive in nature. Damages, on the other hand, are remedial in nature, not preventive. The remedy of injunction is only available if the plaintiff can establish that a continuing or anticipated injurious act is not adequately compensable in damages. Id. at 800. This is not to say that an injunction and damages cannot be sought or awarded in the same cause of action. They are merely alternative or concomitant remedies. Wussow v. Commercial Mechanisms, Inc., 97 Wis. 2d 136, 152, 293 N.W.2d 897 (1980).
*430 The apparent goal of the plaintiffs in the underlying action was the desegregation of the Milwaukee area school system. The amended complaint sought only declaratory and injunctive relief whose purpose was "to eliminate the remaining vestiges of segregation in the school districts and schools in the Milwaukee metropolitan area." The amended complaint did not seek to presently compensate the victims of part discrimination. Therefore, no "damages" were sought in the underlying action.
The school districts argue and the majority concludes that the compensatory programs requested in the amended complaint were remedial in nature to compensate children for past inadequate education and, thus, should constitute "damages." In support of this position, they cite Milliken v. Bradley (Milliken II), 433 U.S. 267 (1977). In Milliken II, the United States Supreme Court held that in discrimination cases, a district court can order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation if the programs are guided by equitable principles. Milliken II, 433 U.S. at 279-80. Milliken II is cited for the proposition that, like damages, compensatory educational programs are intended to restore the victims of discriminatory conduct to the position they would have enjoyed had education been administered in a nondiscriminatory manner. See Milliken II, 433 U.S. at 282. However, Milliken II does not support the proposition for which it has been cited.
The Milliken II Court clearly explains that the remedial programs do not constitute damages:
The educational components, which the District Court ordered into effect prospectively, are plainly designed to wipe out continuing conditions of inequality . . . . Unlike the award in Edelman, the injunction *431 entered here could not instantaneously restore the victims of unlawful conduct to their rightful condition. Thus, the injunction here looks to the future, not simply to presently compensating victims for conduct and consequences completed in the past.
These programs were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in Edelman. . . . That the programs are also "compensatory" in nature does not change the fact that they are part of a plan that operates prospectively to bring about the delayed benefits of a unitary school system.
Milliken II, 433 U.S. at 290 & n.21 (emphasis in original). Similar to the educational programs in Milliken II, the programs requested in the underlying amended complaint here concerned the future provision of education. The costs of compliance with an injunction cannot reasonably be regarded as a sum payable "as damages." Damages are legal recompense for injuries sustained. Therefore, the costs of programs designed to encourage the future provision of nondiscriminatory education may not have any relation with harm to specific third parties and cannot be considered "damages" as that term is used in the insurance policies.
It should be recognized, however, that even though the main purpose of damages is compensation, there are elements of damages that are not entirely compensatory. For example, punitive damages generally are sums awarded apart from compensatory damages, usually as punishment or deterrent levied because of particularly aggravated misconduct on the part of the defendant. The aggravated misconduct is so closely related to the loss that we have determined that punitive damages are covered by the "damages" qualifier within the insurance policy. See Brown v. Maxey, 124 Wis. 2d 424, 369 *432 N.W.2d 677 (1985), and Cieslewicz v. Mutual Service Cas. Ins. Co., 84 Wis. 2d 91, 267 N.W.2d 595 (1978).
The limited construction of the term "damages" is also consistent with the basic grant of coverage in the insurance policies. The insurers agreed to pay "all sums which the insured shall become legally obligated to pay as damages." The insurers did not agree to pay "all sums which the insured shall become legally obligated to pay." The addition of "as damages" serves as a qualifier, a limit to coverage. The broad, expansive interpretation of "damages" proposed by Shorewood and Greenfield and adopted by the majority renders the phrase "as damages" mere surplusage because any expense incident to litigation is now covered by the policies. Ignoring the rules of construction that it quite adamantly claims to adhere to, the majority has rewritten the insurance contract by eliminating the qualifier "damages" and included coverage not agreed to by the parties and for which no premium was paid.
I agree that it is preferable to define important terms contained in a contract, especially a contract of insurance. However, a term is not ambiguous merely because the contract leaves the term undefined. I submit that even if the term "damages" was defined in the contract of insurance, this court would still be addressing the issue of whether costs of complying with injunctive relief and attorney fees sought by an opposing party constitute "damages" as that term is defined under the policy. Furthermore, most insureds probably would not even read the definition of "damages" that would become one of a myriad of definitions provided by the insurance policy.
The amended complaint in the underlying litigation also requested "an order pursuant to 42 U.S.C. sec. 1988 allowing plaintiffs their costs and reasonable attorneys' *433 fees." The majority opinion at 423 concludes that "[t]he term `damages,' according to its ordinary usage, includes all forms of civil liability, including attorney fees. Under the insurance policies, the school district had a reasonable expectation of recovering from the insurance carriers any attorney fees they became obligated to pay to an opposing party." I disagree.
The language of 42 U.S.C. sec. 1988 explicitly provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." The insurers correctly point out that only one case has specifically interpreted this provision of 42 U.S.C. sec. 1988. In Board of County Commissioners of the County of Larimer v. Guarantee Ins. Co., 90 F.R.D. 405 (D. Colo. 1981), the county was a defendant in a civil rights action and sought indemnification from its insurer for the payment of attorney fees which were awarded pursuant to 42 U.S.C. sec. 1988. Similar to the present situation, the underlying complaint sought only declaratory and injunctive relief. The insurance policy provided coverage for "all sums which the insured shall become legally obligated to pay as damages because of injury." The Larimer court held that attorney fees "awarded and costs assessed are not damages as contemplated by the [insurance] policy definition or as understood by the term's ordinary customary meaning in civil rights actions." Larimer, 90 F.R.D. at 407.
The majority opinion relies upon City of Ypsilanti v. Appalachian Ins. Co., 547 F. Supp. 823 (E.D. Mich. 1982), aff'd, 725 F.2d 682 (6th Cir. 1983). The Ypsilanti court addressed the issue of whether the insurance company agreed in the contract of insurance to pay the award of attorney fees assessed against the City of Ypsilanti in the underlying litigation. It held that in a civil rights suit, attorney fees are a form of damage which the *434 insurer contracted to cover. Ypsilanti, 547 F. Supp. at 828. The Ypsilanti court reasoned that attorney fees awarded in the underlying litigation do not constitute "costs" under the insurance policy because the definition of "costs" refers only to the expense of carrying on the defense of a lawsuit. It does not refer to sums for which the insured is found liable, such as an award of attorney fees. Id. at 827. The Ypsilanti court, therefore, concluded that by default such attorney fees must be considered "damages." However, Ypsilanti did not involve 42 U.S.C. sec. 1988, which expressly treats an award of attorney fees "as part of the costs."
In Hutto v. Finney, 437 U.S. 678 (1978), the United States Supreme Court explained the distinction between damages and attorney fees awarded as part of the costs under 42 U.S.C. sec. 1988. The Hutto Court recognized that only prospective injunctive relief can be awarded against a state, not retroactive relief such as damages. It then upheld an award of attorney fees against the state by distinguishing between damages and costs:
Unlike ordinary "retroactive" relief such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief. (An award of costs will almost invariably be incidental to an award of prospective relief, for costs are generally awarded only to prevailing parties . . . and only prospective relief can be successfully pursued by an individual in a suit against a State.)
Hutto, 437 U.S. at 695 n.24.[4] Therefore, an award of attorney fees under 42 U.S.C. sec. 1988 does not constitute "damages." The insurers did not have a duty to *435 defend the school districts in the underlying action based solely on a request for attorney fees under 42 U.S.C. sec. 1988.
Similar to the attorney fees requested in the underlying amended complaint, the plaintiffs' attorney fees in the underlying litigation which the school districts voluntarily agreed to pay pursuant to the settlement agreement are costs of litigation and, therefore, do not constitute "damages." Furthermore, the insurance contracts at issue here exclude coverage for "liability assumed by the insured under any contract or agreement." Because the insurers did not participate in or consent to the settlement agreement, the insurers should have no duty to indemnify Shorewood and Greenfield for the attorney fees they agreed to pay pursuant to the settlement agreement.
For the reasons set forth, I conclude that the term "damages" as it is used in the insurance policies encompasses, only legal damages as compensation for past wrongs. It does not include the costs of complying with injunctive relief nor does it include attorney fees that are sought by an opposing party as part of the costs of litigation. Accordingly, I dissent.
I am authorized to state that JUSTICES ROLAND B. DAY and DONALD W. STEINMETZ join in this dissenting opinion.
NOTES
[] Motion for reconsideration filed, June 8, 1992.
[] Motion for reconsideration filed, June 9, 1992.
[] Motion for reconsideration filed, June 8, 1992.
[] Motion for reconsideration filed, June 8, 1992. Motions for reconsideration not disposed of at the time the volume went to press. Their dispositions will be reported in a later volume.
[1] The Continental policies promise to indemnify the insured for:

ultimate net loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law . . . because of personal injury
. . ..
The U.S. Fire policies agree that the insurer will pay on behalf of the insured the "ultimate net loss," defined in relevant part as:
all sums which the insured is legally obligated to pay as damages whether by reason of adjudication or settlement, because of . . . personal injury . . . to which this policy applies . . ..
Wausau's combination casualty policies contain endorsements that state:
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury sustained by any person or organization . . .. Wausau's umbrella policies covering July 1, 1981 to July 1, 1983 state that the insurer will:
pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company agrees to pay, as damages because of . . . personal injury . . . [t]o which this policy applies . . ..
The umbrella policies issued to the school district of Shorewood covering July 1, 1983 to July 1, 1987 contain the same obligation to pay "because of . . . discrimination injury . . .."
[2] The Continental Casualty policies define "personal injury" to include "discrimination except that committed by, at the discretion of, or with consent of the insured."

The U.S. Fire policies covering July 1, 1978 to July 1, 1981 state: "`Personal injury' means . . . (d) discrimination not committed by or at the direction of the insured."
The Greenfield school district argues that the U.S. Fire policy issued to Greenfield covering July 1, 1983 to July 1, 1984 actually provides greater coverage than the other insurance policies. The policy states: "`Personal injury' means injury, such as but not limited to . . . discrimination . . .." In defining an "occurrence," the policy then excludes from coverage "an offense committed with actual malice or the willful violation of a penal statute or ordinance committed by or with the knowledge of consent of the insured." We need not address Greenfield's argument in this appeal; we treat the 1983-84 policy as covering at least those instances of discrimination covered by the other policies.
Wausau's umbrella policies covering July 1, 1981 to July 1, 1983 state:
"Personal Injury" means . . . (e) Injury sustained during the policy period arising out of discrimination because of race, religious creed, color or national origin, provided insurance with respect thereto is not prohibited by law. In defining an "occurrence," the policy limits coverage to "personal injury . . . neither expected nor intended from the standpoint of the insured."
Wausau's umbrella policies covering July 1, 1983 to July 1, 1987 state:
"Discrimination injury" means injury sustained by any person arising out of discrimination committed during the policy period within any jurisdiction in which and to the extent that a cause of action therefore may be maintained.
In defining an "occurrence," the policy limits coverage to "discrimination injury . . . unintended from the standpoint of the insured."
Wausau's combined casualty policies issued to Greenfield contain an endorsement stating:"`Personal injury' means (1) any injury to the feelings or reputation of a natural person, including mental anguish. . .." The endorsement excludes coverage to personal injury arising out of "any act committed by or at the direction of the insured for the purpose of causing personal injury or with the knowledge that it will cause personal injury."
[3] The quoted passage is found in the U.S. Fire policies. The Continental policies state: "The Company. . . shall have the right and duty to defend any suit seeking damages on account of such personal injury. . . even if the allegations of the suit are groundless, false or fraudulent. . .." The Wausau policies similarly state that, for injuries covered by the policies, the company will "defend any suit against the insured alleging such damages and seeking recovery on account thereof, even if such suit is groundless, false or fraudulent . . .."
[4] The legislature repealed sec. 116.51, Stats. 1981-82, effective July 1, 1984. 1983 Wis. Act 27, sec. 1446.
[5] The school districts also claim that the Milwaukee Board's allegations under 42 U.S.C. sec. 2000d require only a showing of unintentional discrimination. We need not address this argument.
[6] The parties cite numerous decisions involving the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. secs. 9601 et seq. Some cases conclude that clean-up expenses and other Superfund costs constitute damages under the insurance policies; other cases reach the opposite conclusion. Because CERCLA cases may require the consideration of issues not before us, we will not examine the CERCLA decisions in deciding the case at bar.
[7] For other cases adopting a similar position, see, e.g., Ladd Constr. Co. v. Insurance Co. of N. Am., 391 N.E.2d 568, 570-72 (Ill. App. 1979) (denying coverage to remove debris from railroad tracks); Lido Co. of New England v. Fireman's Fund Ins. Co., 574 A.2d 299 (Me. 1990) (applying New Hampshire law and denying coverage for the cost of recovering gasoline spilled by the insured on the insured's property); Maryland Cup Corp. v. Employers Mut. Liab. Co. of Wisconsin, 568 A.2d 1129, 1132-34 (Md. App. 1990) (denying coverage to an insured when the plaintiff in the underlying suit alleged employment discrimination and was limited to equitable relief). See also Annotation, Liability Insurer's Duty to Defend as Including Injunction Proceedings, 53 A.L.R.2d 1132 (1957).
[8] See, e.g., Kaun v. Industrial Fire & Cas. Ins. Co., 148 Wis. 2d 662, 667-69, 436 N.W.2d 321 (1989); Gonzalez v. City of Franklin, 137 Wis. 2d 109, 122, 403 N.W.2d 747 (1987); Brown v. Maxey, 124 Wis. 2d 426, 442, 369 N.W.2d 677 (1985); Kremers-Urban Co. v. American Employers Ins., 119 Wis. 2d 722, 735-36, 315 N.W.2d 156 (1984); Caporali v. Washington Nat. Ins. Co., 102 Wis. 2d 669, 675-67, 337 N.W.2d 218 (1981); Stanhope v. Brown County, 90 Wis. 2d 823, 848-49, 280 N.W.2d 711 (1979); Lawver v. Boling, 71 Wis. 2d 408, 414, 238 N.W.2d 514 (1976) Garriquenc v. Love, 67 Wis. 2d 130, 134-35, 226 N.W.2d 414 (1975); Prieger v. Exchange Mut. Ins. Co., 6 Wis. 88, 104 (1858).
[9] See, e.g., 42 U.S.C. sec. 1988; 42 U.S.C. secs. 2000e-5(g) and (k) (employment discrimination under the federal Civil Rights Act); sec. 111.39(4)(c), Wis. Stats. 1989-90 (Wisconsin Fair Employment Act as interpreted by Murphy v. Industrial Comm'n, 37 Wis. 2d 704, 155 N.W.2d 545 (1968) (injunctive relief), and Watkins v. LIRC, 117 Wis. 2d 753, 345 N.W.2d 482 (1984) (attorney fees)).
[10] Nixon v. Nixon, 39 Wis. 2d 391, 396, 158 N.W.2d 919 (1968).
[11] The Cieslewicz court wrote:

Essentially, what the insurer has done in this case is to `sandbag' its own insured by using a provision which is phrased in very broad terms and which gives the insured the reasonable impression that protection is afforded. Upon presentation of the claim, however, the insurer has attempted to avoid responsibility for part of the damages, on the theory that multiple damages are not within the terms of the policy. In accordance with the principles adopted by this court in construing a policy of insurance, we hold that the multiple damages are included in the coverage clause of the policy. (84 Wis. 2d at 98.)
The Maxey court concluded that the above reasoning was equally appropriate to its case involving punitive damages.
[12] 42 U.S.C. sec. 1988(b) states in full:

Attorney's fees
In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party other than the United States, a reasonable attorney's fee as part of the costs.
[13] See Marek v. Chesny, 473 U.S. 1, 44-51 (1985) (Brennan, J., dissenting), for federal "statutes that refer to attorney fees as `part of costs'", for federal "statutes that do not refer to attorney fees as part of costs," and for federal "statutes that may or may not refer to attorney fees as part of costs."
[14] Parties who vindicate their rights through settlement of a civil rights lawsuit may be deemed the "prevailing party" and awarded attorney fees under sec. 1988. Maher v. Gagne, 448 U.S. 122, 129 (1980).
[1] See Caporali, 102 Wis. 2d at 676.
[2] See Fee v. Heritage Mut. Ins. Co., 17 Wis. 2d 364, 117 N.W.2d 269 (1962), overruled on other grounds by In Matter of Estate of Stromsted, 99 Wis. 2d 136, 144, 299 N.W.2d 226 (1980). In Fee, this court recognized that "damages" as that term is used in a contract of insurance has an accepted technical meaning in the law. Fee, 17 Wis. 2d at 366. Courts in many other jurisdictions as well have determined that in the insurance context "damages" has an accepted technical meaning in the law. Aetna Casualty & Surety Co. v. Hanna, 224 F.2d 499, 503 (5th Cir. 1955); Continental Ins. v. Northeastern Pharmaceutical, 842 F.2d 977, 985 (8th Cir. 1988); Cincinnati Ins. Co. v. Milliken and Co., 857 F.2d 979, 981 (4th Cir. 1988); Maryland Casualty Co. v. Armco, Inc., 822 F.2d 1348, 1352 (4th Cir. 1987); Ladd Const. Co. v. Ins. Co. of North America, 391 N.E.2d 568, 571 (Ill. App. 1979); Garden Sanctuary, Inc. v. Ins. Co. of North America, 292 So. 2d 75, 77 (Fla. App. 1974); CPS Chemical v. Continental Ins., 536 A.2d 311, 315 (N.J. Super. A.D. 1988); Travelers Ins. Co. v. Ross Electric of Washington, Inc., 685 F. Supp. 742, 745 (W.D. Wash. 1988); and Desrochers v. New York Cas. Co., 106 A.2d 196, 198 (N.H. 1954), among others.
[3] The majority defers to Webster's Third New International Dictionary for the "common and ordinary meaning" of the term "damages." "According to Webster's, `damages' means `the estimated reparation in money for detriment or injury sustained; compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right.'" Majority opinion at 414. The definition of "damages" provided by Webster's dictionary and utilized by the majority is basically a reiteration of the accepted technical meaning of the term. It is compensation for past wrongs or injuries. There is no reference in Webster's dictionary that would lead even a reasonable layperson to believe that "damages" includes the cost of complying with prospective injunctive relief or attorney fees sought by an opposing party in the underlying litigation.

The majority's expansive definition of the term "damages" does not comport with even its ordinary and common meaning. For example, assume a landowner obtained an injunction to prospectively prevent a trespasser from cutting across his land on the way to work. Under the majority's expansive definition of "damages," the trespasser's insurer would be liable to the trespasser for the reasonable value of the extra daily effort by the trespasser to walk around the landowner's property. Even a reasonable layperson would conclude that this does not constitute "damages."
[4] See also Marek v. Chesney, 473 U.S. 1, 9 (1985).